THE HONORABLE JOHN C. COUGHENOUR

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

LEONARD ROLLINS, et al.,

             Plaintiffs,

    vs.

TRAYLOR BROS., INC., and
TRAYLOR/FRONTIER-KEMPER JV,

           Defendants.

NO.  2:14-cv-1414 JCC

**PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION**

**NOTED:  July 31, 2015
ORAL ARGUMENT REQUESTED**

COME NOW the Plaintiffs who respectfully move the court pursuant to Fed. R. Civ. P. 23 for certification of a class of laborers of African American descent with dark skin and/or appearing African American (hereinafter, "African American Laborers") who worked for Defendants at the University of Washington Sound Transit Link Light Rail project and were dismissed shortly after being hired, dismissed after working only a few shifts, and/or otherwise treated unfairly.[1]

## I.  INTRODUCTION

This case arises because Defendants failed to implement any measures or controls to ensure that management made personnel decisions objectively, without discriminatory intent or having a discriminatory impact on members of legally protected classes.  Instead, Defendants' subjective and unmonitored employment practices permitted a prevalence of illegal bias and

---

[1] Plaintiffs note that this definition is a modification of the definition proposed in their complaint.  6A Fed. Proc. § 12:62; 8 Newberg § 24:71, at 276.

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 2:14-cv-1414 JCC - 1

**Teller & Associates, PLLC**
1139 34th Ave, Suite B
Seattle, WA  98122
(206) 324-8969  Fax: 860-3172

disparate impact on members of protected classes, including African American Laborers, who bring this lawsuit on behalf of themselves and those similarly situated.

## II. BACKGROUND & RELEVANT FACTS

In 2009 the Central Puget Sound Regional Transit Authority ("Sound Transit") approved the U220 Contract with Defendant Traylor/Frontier Kemper JV ("TFK"), operated and managed in part by Defendant Traylor Bros. Inc. ("Traylor Bros."), to excavate and construct two transit tunnels from the University of Washington to Capitol Hill (the "UW Light-Rail Project" or the "U220 Contract").  Traylor Bros., a 70 year old family-owned construction company based out of Evansville, Indiana, began working on the project in 2009 and tunneling operations officially began in May 2011.

Sound Transit required Defendants to use the dispatch resources and procedures of local labor unions to acquire workers, including the Laborer's Local 440.  ECF No. 25-1 at 2-6. Labor unions had specific dispatch procedures in place, established through their own agreement with Sound Transit, which was implemented across all Sound Transit light rail projects.  *Id.* at 6. The Local 440 dispatched laborers to Sound Transit projects pursuant to this agreement.  ECF No. 26 at 4-6 (Clune Decl).

Local 440 categorized its workers into different Groups between I through VI.  *Id.* at 3. Laborers perform all kinds of general labor, including, but not limited to, building fences, traffic control on a job site, grading, digging ditches, shoveling, jackhammering, nozzleman and shotcrete work, diving, mining, and compressed air work.  *Id.* at 2-4.  The Local 440 closely monitored the skills of its members and only dispatched laborers that were qualified to perform the kinds of work requested by any Sound Transit contractor.  *Id.*  The Local 440 dispatched laborers by procedure regardless of race, gender or other protected classes.  *Id.* at 3-4.

**Teller & Associates, PLLC**
1139 34th Ave, Suite B
Seattle, WA  98122
(206) 324-8969   Fax: 860-3172

### A. Defendants Maintained a Pattern and Practice of Making Subjective Employment Decisions that Discriminated against African American Laborers

Despite the nondiscriminatory dispatch procedures already in place to ensure Sound Transit contractors had a ready pool of diverse and skilled workers, Traylor Bros. repeatedly rejected skilled and qualified African American Laborers dispatched by the Local 440. ECF No. 25 at 8-9, 11-65. Many African American Laborers were "turned around" before they were ever given a chance because management subjectively questioned, looked over and rejected them on dispatch. *Id.*

For example, Superintendent John Hook stated that "he can tell by looking at the person that they won't be able to handle the task." ECF No. 25-1 at 68; *see also* ECF No. 25-1 at 74 (Helmholz Dep., 165:19-23). Promotion decisions were made without any standardized objective review and based on word of mouth recommendations. *See e.g.* ECF No. 25-1 at 77. Superintendent Burt Dore subjectively and inconsistently interrogated dispatched laborers with sole discretion in making hiring decisions for the entire UW Light-Rail Project. ECF No. 25-1 at 79; ECF No. 25-2 at 4, 13-18.

Dore based his subjective evaluations on his belief that he could, by briefly talking to a person, determine a laborer's tunneling experience, regardless of their actual experience. ECF No. 25-2 at 4-5, 22-24, 29 ("No one lies to me; I know when they've had experience."). One African American Laborer recalled "[Dore] expressed to me that he doesn't think I'm a miner. By looking at me he could see that I'm not a miner." ECF No. 25-2 at 13-14 (Watkins Dep, 47:8-48:17). Another recalled that Dore did not believe he had any experience until he was confronted with the African American Laborer's work portfolio. ECF No. 27-0 at 2 (Tate Decl); *see also* ECF No. 25-2 at 4-5.

When asked about whether vocabulary skills or language barriers interfered with his judgment, Dore stated "I'm not into verbal skills. I don't know anything about that." ECF No. 25-2 at 23 (Dore Interview, 18:6-20:10). For example, Dore was asked if Spanish speaking

**Teller & Associates, PLLC**
1139 34th Ave, Suite B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

worker would be disadvantaged.  He responded stating, "if you knew him, you still hired him" Implying that subjectively "knowing" a person was sufficient.  *Id.*; *but see* ECF No. 25-2 at 28-30.  Even when African American Laborers were able to describe their mining experiences, Mr. Dore expressed disbelief or accused them of lying.  ECF No. 25-2 at 4-5, 32-34; ECF No. 27 at 2:19-3:16 (Tate Decl).

Further Dore evaluated laborers against all the mining tasks that <u>could</u> be performed, but not tasks that were <u>actually</u> needed for the particular job.  For example, Traylor Bros. insisted they needed all of their miners to be able to perform compressed air and hyperbaric work.[2]  ECF No. 25-3 at 2-4; ECF No. 25-2 at 22-23 (Dore, 17:8-18:20).  But Defendants had a contract with Ballard Diving for the provision of compressed air workers and Traylor Bros. did not intend to hire Local 440 Laborers for this limited task.  ECF No. 25-1 at 79 ("We will state they are not covered by the PLA—the laborers will fight that[.]"); ECF No. 25-3 at 6.  Defendants ultimately did not need compressed air workers to be dispatched because the UW Light-Rail Project did not require any hyperbaric interventions.  ECF No. 25-3 at 8.

Traylor Bros. tried to distinguish a need for Group VI miners instead of Group V miners, but a Traylor Bros. Engineer admitted in a transcribed interview that there was no significant difference between a Group V and Group VI classification.  ECF No. 25-3 at 11-12 (Krulc Interview, 21:19-22:12); ECF No. 26-0 at 3:8-10 (Clune Decl).  According to a Traylor Bros. shifter, "A lot of the mining work on the site is general laborers work that a number of people can do.  It doesn't require specialized training."  ECF No. 25-3 at 19.  As one experienced African American Laborer put it, "[t]here was nothing about the work that was especially difficult" and "[i]t doesn't take a lot of skills to do the job that he was doing."  ECF No. 25-2 at 5, 7.  After interviewing a number of witnesses and reviewing Defendants personnel files, Sound

---

[2] Compressed air work is a specialized skill that is similar to underwater diving.  ECF No. 25-1 at 79; ECF No. 25-2 at 38; ECF No.

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 2:14-cv-1414 JCC - 4

**Teller & Associates, PLLC**
1139 34th Ave, Suite B
Seattle, WA  98122
(206) 324-8969  Fax: 860-3172

Transit's investigator, Marcella Flemming Reed, concluded Defendants' "hiring process for laborers, which includes interviews conducted primarily by the U-220 Superintendent [Bert Dore], is subjective, contrary to dispatch hiring hall rules and atypical for Puget Sound contractors."). ECF No. 25-1 at 17; ECF No. 25-2 at 28 ("Lerma has never been interviewed at another site, and he has been in the Union since 2003"); ECF No. 28-0 at 2 (Smith Decl).

If an African American Laborer was allowed to continue on to the worksite, Traylor Bros. followed no consistent process for documenting employee performance and a majority of African American workers did not stay on the project very long. ECF No. 25-1 at 8-9; ECF No. 25-3 at 22; ECF No. 27 at 2-3 (Tate Decl); ECF No. 28 at 2 (Smith Decl); ECF No. 29 at 2 (Rodgers Decl). Superintendent Dore gave broad discretion to his foreman to make termination decisions. For example, one foreman, Mr. Al Brown, rejected every African American employee sent to work for him. ECF No. 25-1 at 44. "Tony Traylor had a lot of influence on the job site. If Mr. Traylor wanted someone off the job site, the worker was gone." ECF No. 30 at 3-4 (Hargrove Decl). When one African American Laborer confronted Mr. Dore about Mr. Brown's termination decision Mr. Dore responded to the effect he "has worked with Mr. Brown for a while and he knows what he is talking about and if Mr. Brown makes a decision then [Dore] is not going to question it." ECF No. 31 at 5 (Rollins Decl). "Normally, companies have a system of getting written up or some formal discipline before a person could be fired. On the UW Light-Rail Project foreman fired people without warning or documentation. Termination decisions were arbitrary and there was no rhyme or reason to it." ECF No. 30 at 3-4 (Hargrove Decl).

Forman Scott Stilson stated that he "doesn't have any recollection of the specifics of the complaints or who made them" and that he "doesn't keep notes regarding performance. . . . Stilson is decisive and makes decisions pretty quickly." ECF No. 25-3 at 27-28; ECF No. 30 at 3-4. Foreman Al Brown stated that he "has worked long enough that he can pick up on what

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 2:14-cv-1414 JCC - 5

**Teller & Associates, PLLC**
1139 34th Ave, Suite B
Seattle, WA  98122
(206) 324-8969  Fax: 860-3172

someone knows by watching them work." ECF No. 25-3 at 31. Foreman Steve Carpenter stated that he "can observe someone's work and decide whether they are a good hand or not." ECF No. 25-4 at 3. Although employee terminations were documented for the Local 440 and Sound Transit, even those records were not consistently recorded where "someone might get laid off even though the real question is whether they can effectively perform the work." ECF No. 25-1 at 68-69.

African American Shifter Adam Kellar stated that he felt like Dore discriminated against workers, that there was a lack of opportunity at Traylor Bros. and that overtime was not assigned fairly, though he later recanted his beliefs after lawsuits were filed. ECF No. 25-3 at 16-17.[3] Sound Transit investigator Marcella Flemming Reed reviewed Traylor Bros. disciplinary practices and concluded that "TFK's failure to apply the terms of its own policies and procedures to [African American Laborers], coupled with a failure to provide evidence of discipline for similarly-situated Caucasians, created an unfavorable inference [of race discrimination]." ECF No. 25-1 at 57-58.[4]

## B. Defendants' Decision Makers Freely Exhibited Illegal Bias Towards African Americans and other Protected Classes

One laborer observed "[t]here is no real representation of African Americans in management. . . . When you look at the site, there are no African Americans in positions of high importance. There is no one working in the heading who is African American; they are only tail gunning. African Americans on this site are only given menial jobs. There is an underlying racism there." ECF No. 25-4 at 9. Another laborer observed that he "believes that the work site is racist. Traylor is a company out of Evansville Indiana, where the Ku Klux Klan got its start."

---

[3] At the time Kellar made these statements, Kellar attributed them to his Washington residency, though he did not confirm that a similarly situated Caucasian shifter also from Washington felt the same and Keller did not claim to have any knowledge of a motivation for why he was being treated differently. *Id.*

[4] Ms. Reed went on to note that TFK represented to the Equal Opportunity Commission that it followed its personnel policies, despite later claiming that it was not obligated to do so. ECF No. 25-1 at 51-51.

*Id.* at 14.    Another stated he "understands why some African Americans find the work environment hostile.  They are from the South and have a different attitude about race or how to get along[.]"  ECF No. 25-3 at 22.

Despite alleging a strict and zero tolerance policy against discrimination, Defendants' managers exhibited illegal bias in numerous ways that objective personnel practices could have mitigated had they been followed.    Management regularly emailed sexually explicit pornography, as well as sexist and racist jokes or political statements, demeaning towards women, immigrants, gay and lesbians, and African Americans.  ECF No. 25-4 at p21-24;[5] ECF No. 25-4 at p26-27; ECF No. 25-4 at p29-36; ECF No. 25-4 at p38-44; ECF No. 25-5 at p2-19; ECF No. 25-5 at p21-24.[6]  On one occasion, a Traylor Bros. Assistant Division Manager sent out an email that included racial slurs and remarks. ECF No. 25-5 at p26-29.  On one occasion, a Traylor Bros. Assistant Division Manager sent out an email that included racial slurs and remarks.  ECF No. 25-5 at 26-29.  An Electrical Superintendent shared a racially derogatory email about Trayvon Martin depicting the deceased teenager in a racially charged light.  This Superintendent sent several emails on derogatory and racially insensitive topics.  ECF No. 25-5 at 21-24.

Superintendent John Hook regularly sent sexually explicit emails derogatory of women, Hispanics and immigrants.  ECF No. 25-0 at 6:23-7:4.  Mr. Hook maintained a visible swastika tattoo on his hand.  ECF No. 25-5 at 31;[7] ECF No. 32 at 5:10-11 (Banda Decl); ECF No. 25-3 at

---

[5] It appears that in 2014, a Traylor Bros. manager believed company lawyers instructed members of management to go through their emails and delete the objectionable content before production. ECF 25-4 at 21-24 ("LAWYERS" email).  Discovery is continuing and Plaintiffs expect to see more evidence, but the possible destruction of evidence is concerning.

[6] Plaintiffs have refrained from including in the record hundreds of pages of sexually explicit and demeaning pornography passed among Traylor Bros. managers.  ECF No. 25-0 at 6:23-7:4 (Hitzel Decl).

[7] Hook denies that the tattoo on his right hand is a Nazi or white supremacy symbol, but rather a symbol of Native American luck.  But when Project Manager Jeremy Saperia was asked about this, he explained "that it was a part of his youth and he didn't hold those same feelings now."  ECF No. 25-6 at 54.  It is unclear why Mr. Saperia would give this explanation over a symbol of luck, but it does make sense if the tattoo was indeed a supremacy symbol from Mr. Hook's youth.

**Teller & Associates, PLLC**
1139 34th Ave, Suite B
Seattle, WA  98122
(206) 324-8969  Fax: 860-3172

16.  A Local 302 representative reported to Ms. Reed that Mr. Hook made a racial slur about an African American crane operator.  ECF No. 25-6 at 4.  Superintendent Hook stated that "women are not allowed in the tunnel[,]" ECF No. 25-1 at 69, and David Ferguson, the U-220 Project Director, stated during a public meeting that he believed "[h]aving women in the hole was a problem.  It was just not the right environment."  ECF No. 25-6 at 8; ECF No. 25-2 at 42.  Another laborer heard Dore and Tony Traylor discussing how "they didn't want women in the hole."  ECF No. 25-6 at 13.  A Foreman commented how he "has never seen a woman in the mine."  ECF No. 25-6 at 22.

Superintendent Dore commented about how watching African American laborers working reminded him of prisoners "working on a chain gang.  The only thing missing are the stripes."  ECF No. 33-0 at 3:12-13 (Murphy Decl); ECF No. 30-0 at 2:25-3:1 (Hargrove Decl).  Dore kept a list of workers on his desk with the names of African American Laborers highlighted.  *Id.*  Before losing his job, one African American worker recalled hearing statements by a Shifter/Supervisor describing how "[w]e have had problems with African Americans on other work sites" and later, while looking directly at the African American make a statement to the effect, "Walk like a duck, act like a duck, must be a duck."  ECF No. 25-6 at 26, 30-31 (Pearson Dep, 95:15-96:4).

Traylor Bros. Manager Tony Traylor described African American workers as "moving target[s]" and made racist comments such as "we gotta keep it white; white is right" and "keep it right, keep it white."  ECF No. 32 at 4:14-15 (Banda Decl).  When Mr. Traylor was in the presence of African American's he shortened his statement to "we gotta keep it right!"  *Id.*  Manager Duane Monk made derogatory comments about a female laborer, stating "No hags in the tunnel."  *Id.*  An African American Laborer described to the Sound Transit investigator people calling him "boy" and telling him "You guys are better off shoveling[,]" observing "[t]hey think that these comments are funny, but they are not."  ECF No. 25-4 at 10.

**Teller & Associates, PLLC**
1139 34th Ave, Suite B
Seattle, WA  98122
(206) 324-8969  Fax: 860-3172

Individual experiences of multiple African American Laborers are compelling and common. One African American Laborer was terminated just weeks after complaining about hearing the "N" word on the worksite. ECF No. 33-0 at 2:14-16 (Murphy Decl). Another African American Laborer described making repeated objections to the environment he felt was hostile to African Americans. "If they bother him again, then he tells them again" and then he "will make an effort to stay away from the person so that they couldn't bother him." ECF No. 25-3 at 22; *see also* ECF No. 30-0 at 2 (Hargrove Decl). This laborer described how "white coworkers can get away with standing around more than African American coworkers." ECF No. 25-3 at 4; *see also* ECF No. 30 at 3 (Hargrove Decl).

Managers repeatedly failed to assign African American Laborers work (called "lining out") and expressed frustration when they asked for work to do. ECF No. 28 at 2-3 (Smith Decl); ECF No. 31 at 3 (Rollins Decl); ECF No. 30 at 2 (Hargrove Decl). Several African American Laborers reported being assigned menial and demeaning tasks such as roaming the grounds and picking up paper and trash, or office custodial work. ECF No. 25-4 at 15; ECF No. 25-6 at 26-27; ECF No. 34-0 at 2-4 (Wright Decl); ECF No. 28-0 at 3 (Smith Decl); ECF No. 27-0 at 4-5 (Tate Decl); ECF No. 32-0 at 2-4 (Banda Decl); ECF No. 30-0 at 2 (Hargrove Decl).

### C. Statistical Analysis Shows Discrimination against African American Laborers Did Not Occur by Chance

After hearing repeated complaints about race and gender discrimination Sound Transit hired Marcella Flemming Reed to investigate the matter. ECF No. 25-1 at 11. Ms. Reed found that Traylor Bros. lax, undocumented and subjective employment practices had a disparate impact on African American Laborers. ECF No. 25-1 at 15, 42-60. Specifically, Ms. Reed found "Anecdotal evidence and statistical analysis of hourly payroll data indicate that the subjective decisions made by TFK personnel in the hiring and termination processes had a disparate impact that was highly correlated to race with regard to the number of turnarounds and

**Teller & Associates, PLLC**
1139 34th Ave, Suite B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

terminations[.]"    ECF 25-1 at 15-18.    In reaching this conclusion, Sound Transit hired statisticians who analyzed dispatch and wage records and concluded that the disparity between African American's and  Caucasian laborers in turnarounds and hours worked was statistically significant at a 99% level of confidence, and more than three standard deviations away from an equality of termination rates and hours worked.  ECF No. 25-1 at 13; ECF No. 25-1 at 8-9.  It is not possible that such inequality could occur by chance.

### D. Sound Transit, an Agency of the State of Washington, Concluded that Defendants' Actions had a Disparate Impact on African American Laborers

In response to Ms. Reed's findings, Defendants argued to Sound Transit that Ms. Reed and the statisticians missed the "central issue" that African American Laborers were simply not qualified.  ECF No. 25-6 at 36.  But the Local 440 did not violate Sound Transit policy by dispatching unqualified African American Laborers or dispatching more African American Laborers to the UW Light-Rail Project that would explain the inequality.  ECF No. 26-0 at 4-6 (Clune Decl).  Other tunneling contractors and projects experienced no problems with African American Laborers, and the light rail project from Capitol Hill to downtown (a substantially similar tunneling project) showed no disparity in turnarounds, terminations or hours worked.  ECF No. 26-0 at 4-6 (Clune Decl); ECF No. 25-1 at 13-14.  Further the argument does not fit with the facts where rejected African American Laborers had substantial qualifications, but were nonetheless rejected by Dore and his managers.  *See e.g.* ECF Nos. 26-34.

Ms. Reed "concluded that one cannot ignore the unexplained adverse impact against [African American Laborers] in hiring and termination decisions" and that she "cannot rule out the possibility that race was a motivating factor in the rejection of [African American] laborers[.]"  ECF No. 25-1 at 55.[8]  The Sound Transit Board reviewed and accepted Ms. Reeds

---

[8] Ms. Reed also found that "the weight of the evidence supports a finding that certain employment practices discriminated against women."  ECF No. 25-1 at 58.

**Teller & Associates, PLLC**
1139 34th Ave, Suite B
Seattle, WA  98122
(206) 324-8969  Fax: 860-3172

conclusions. ECF No. 25-6 at 40-47. Sound Transit required Defendants to comply with an Action Plan requiring, among other tasks:

- To "identify and document specific skills required for an assignment[.] List only the skills required for the assignment; do not include skills which are not required in order to perform the expected work[.]" *Id.* at 43.

- To "Document the interview process[.] Ask all applicants the same general questions[.] Formally document answers[.]" *Id.*

- To "Document the reason for a decision to hire or not to hire[.]" *Id.* at 44.

- "Do not base decisions to hire on way a person looks; do not assume a person will or will not be able to perform the job based on physical appearance or demeanor[.]" *Id.*

- "Document performance concerns for all employees[.]" *Id.*

Defendants continued to assert that its hiring practices were acceptable, though Defendants admitted that they failed to use documentation in making disciplinary decisions, agreed to implement objective processes to support employment decisions, and agreed to end their system of assessing laborers against skills that were not needed for a particular job. ECF No. 25-6 at 50 ("With regard to the use of the Dispatch Request Form and the interview and sign-off process, TFK will list only the skills required for the assignment, and will not include skills that are not required to perform the expected work.").

## III. AUTHORITY AND ARGUMENT

The four prerequisites to class certification are numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a); *Wal–Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011). In addition, a class action must satisfy the requirements of one of the subdivisions of Rule 23(b). Fed. R. Civ. P. 23(b). Here, Plaintiffs seek certification under Rule 23(b)(3), which requires a finding that questions of law or fact common to class members

**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION - 2:14-cv-1414 JCC - 11**

**Teller & Associates, PLLC**
1139 34th Ave, Suite B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

predominate over any questions affecting only the individual members, and that a class action is superior to other available methods for fair and efficient adjudication of the controversy.

The Court's examination of the class certification prerequisites may overlap with the merits of a claim. *Dukes*, 131 S.Ct. at 2551 (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160–61 (1982)). But as the Supreme Court later clarified, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S.Ct. 1184, 1194–95 (2013).

**A. Plaintiffs Satisfy the Class Certification Requirements Under Rule 23(a)**

**1. <u>Plaintiffs Satisfy the Numerosity Requirement and Joinder Would be Impractical</u>**. Fed. R. Civ. P. 23(a)(1) states that the proposed class must be "so numerous that joinder of all members is impracticable[,]" but it does not demand that joinder be impossible. *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913 (9th Cir.1964). "The numerosity requirement is not tied to any fixed numerical threshold; rather, it 'requires examination of the specific facts of each case and imposes no absolute limitations.'" *Troy v. Kehe Food Distributors, Inc.*, 276 F.R.D. 642, 652 (W.D. Wash. 2011) (quoting *Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 330 (1980)).

When evaluating the impracticability of joinder courts consider the geographic dispersion of class members. *Moore v. Napolitano*, 926 F. Supp. 2d 8, 28 (D.D.C. 2013) (certifying a minimum class of 27 members). Courts also consider the available financial resources of individuals as well as their ability to institute individual lawsuits. *Anderson v. Pa. Dep't of Pub. Welfare*, 1 F.Supp.2d 456, 461 (E.D.Pa.1998).

Plaintiffs are presently aware of at least 32 African American Laborers, including the named Plaintiffs. ECF No. 25-0 at 7:5-8 (Hitzel Decl). Courts have held that this number is sufficient to satisfy the numerosity requirement. *See e.g. In Re Kirschner Medical Corporation Securities Litigation*, 139 F.R.D. 74, 78 (D.Md. 1991); *Moore*, 926 F. Supp. at 28. But other

**Teller & Associates, PLLC**
1139 34th Ave, Suite B
Seattle, WA  98122
(206) 324-8969   Fax: 860-3172

facts unique to this case also support the impracticability of joinder. Members of the potential class are laborers with limited income and resources and many do not have any stability of income. Most are focused on getting their next job to put food on the table for their families. Some individuals have since moved out of Washington State in an effort to find stable and gainful employment. Some were encouraged to move on after their union representatives helped them find employment elsewhere. ECF No. 25-2 at 30. Finally, and perhaps the most compelling reason that joinder is impracticable: Sound Transit's investigator found that laborers working on the UW Light-Rail Project had a reasonable and valid fear of retaliation. ECF No. 25-1 at 46-48. Many African American Laborers chose not to protect their civil rights in an effort to keep their jobs and remain in good standing in the tunneling industry, which provides laborers with some of the most stable and high paying jobs. *Id.*; *See also* ECF No. 30 at 4:2-11.

Given the presently known number of African American Laborers and the unique factors challenges these individuals faced, this Court should find that the class is sufficiently numerous under Rule 23(a)(1).

**2.** <u>**There Are Common Questions of Law and Fact**</u>. Plaintiffs, on behalf of all African American Laborers working for the UW Light Rail Project, allege a pattern and practice of disparate treatment and disparate impact based on race. ECF No. 6 at 10. "[R]acial discrimination is by definition class discrimination" but Plaintiffs "must prove much more than the validity of his own claim." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 148 (1982). Instead "[c]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Dukes*, 131 S.Ct. at 2551. It is not necessary that members of the proposed class "share every fact in common or completely identical legal issues." *Rodriguez v. Hayes*, 591 F.3d 1105, 1122 (9th Cir.2010). Rather, the "existence of shared legal issues with divergent factual predicates is sufficient[.]" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir.1998). What matters is "the capacity of a classwide proceeding to generate common

**PLAINTIFFS' MOTION FOR CLASS**
**CERTIFICATION - 2:14-cv-1414 JCC - 13**

**Teller & Associates, PLLC**
1139 34th Ave, Suite B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

answers apt to drive the resolution of the litigation." *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 506 (N.D. Cal. 2012) (Quoting *Dukes*, 131 S.Ct. at 2551). In other words, can a classwide proceeding "produce a common answer to the crucial question *why was I disfavored.*" *Dukes*, 131 S. Ct. at 2552.

      (a)    <u>Disparate Impact Claims are Common and Appropriate for Resolution on a Class-Wide Basis</u>.

For disparate impact claims (where proof of intent is not required), Plaintiffs "must begin by identifying the specific employment practice that is challenged." *Dukes*, 131 S.Ct. at 2555-56; *see also* 42 U.S.C. § 2000e–2(k); *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986–87 (1988); *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971). "[G]iving discretion to lower-level supervisors can be the basis of Title VII liability under a disparate-impact theory— since 'an employer's undisciplined system of subjective decisionmaking [can have] precisely the same effects as a system pervaded by impermissible intentional discrimination.'" *Dukes*, 131 S.Ct. at 2553-54 (quoting *Watson*, 487 U.S. at 990-91). The Ninth Circuit views substantial reliance on subjective criteria with suspicion:

> Subjective job criteria present potential for serious abuse and should be viewed with much skepticism. Use of subjective job criteria not only has, in many instances, a disparate impact on minorities, but also provides a convenient pretext for discriminatory practices. Subjective criteria may easily be asserted as the reason for an adverse employment decision when, in fact, the reason was discriminatory. Moreover, where the job in question involves skills which are primarily physical or mechanical, or are tangible or objective in nature, ... it is more likely that subjective criteria can be used as an excuse for discrimination.

*Nanty v. Barrows Co.*, 660 F.2d 1327, 1334 (9th Cir.1981), *overruled on other grounds*, *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 760 (9th Cir.1996).

The common employment practices at issue here are similar to those discussed as eligible for certification in *Duke*, and actually certified in *Ellis* and *Brown*: The broad and subjective discretion Traylor Bros. gave worksite Superintendents and Foreman to make

employment retention, discipline and termination decisions without consistency or documentation. *See Ellis*, 285 F.R.D. at 531-32; *Brown v. Nucor Corp.*, ___ F.3d ___, 2015 WL 2167646 at *16-18 (4th Cir. May 11, 2015).

The employment practices challenged here and those challenged in *Dukes* are starkly different. "[W]hen the claims focus in part on the exercise of managerial discretion, it is reasonable to suspect that the larger the class size, the less plausible it is that a class will be able to demonstrate a common mode of exercising discretion." *Ellis*, 285 F.R.D. at 509. As described in *Ellis*, *Dukes* involved a multitude of job categories, both hourly and management employees, and both pay and promotion claims. But the challenged practices here involve a small class of laborers, not 1.5 million employees. Further, discriminatory decisions here are made by a small group of project specific decision-makers, not thousands of individual supervisors and managers dispersed across all 50 states. *See also Brown*, 2015 WL 2167646 at *11-13.

As similarly described in *Ellis* and *Brown*, Traylor Bros. practiced an entirely subjective and undocumented process of evaluating, disciplining and retaining employees that applied to all employees within the proposed class. Here, managers based their opinions of laborers by briefly looking at them and talking to them. African American Laborers' actual qualifications were not believed and disregarded. Termination decisions were not questioned and performance was not documented. In *Ellis*, Costco relied "on unwritten and informal evaluation of candidates by senior management" without documentation or support for employment decisions. *Ellis*, 285 F.R.D. at 531-32. Here, Superintendents and Forman similarly made termination and retention decisions based on subjective evaluations. The employment practice at issue is analyzed as one employment practice and this practice is common among all class members.

(b)　　Plaintiffs' Pattern and Practice Disparate Treatment Claims are Both Common and Appropriate for Resolution on a Class-Wide Basis.

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 2:14-cv-1414 JCC - 15

To establish class certification under a pattern and practice disparate treatment theory Plaintiffs must demonstrate "[s]ignificant proof that an employer operated under a general policy of discrimination." *Dukes*, 131 S.Ct. at 2553; *Ellis*, 285 F.R.D. at 510-530 ("the entire class was subject to the same allegedly discriminatory practices."). The discrimination must manifest itself "in the same general fashion[,]" for example, where the employer relies on "entirely subjective decisionmaking processes." *Id.; Falcon*, 457 U.S. at 159 n. 15. "Plaintiffs need not prove absolute uniformity, but only a 'regular' practice. Accordingly, 'at the liability stage of a pattern-or-practice trial the focus often will not be on individual hiring decisions, but on a pattern of discriminatory decisionmaking.'" *Ellis*, 285 F.R.D. at 518 (quoting *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 876 (1984) (citations omitted)). Plaintiffs' can certify a class with statistical and anecdotal evidence, especially when combined, that provide precisely the 'glue' of commonality that the *Dukes* court demanded. *Brown*, WL 2167646 at *15. This is true even where the pattern is the result of discretionary decision-making. *Id. Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307-09 (1977).

The pervasiveness of subjective decision making, combined with numerous examples of illegal bias, as well as statistical evidence provides more than enough support for certification of class disparate treatment claims. Defendants' actions were widely subjective where Superintendents and Forman acknowledged that they did not track performance, they judged workers by looking at them, and they kept no documentation to support their termination decisions. Plaintiffs' expert witness, Dr. Paul Torelli, verified that Defendants terminated African American Laborers more frequently than non-African American Laborers at a statistically significant rate of *more than three standard deviations* away from an equality of termination rates. ECF No. 25-1 at 8-9. Additionally, Dr. Torelli verified that Defendants provided African American Laborers with fewer hours of work per week at a statistically significant rate of *more than three standard deviations* away from an equality of hours worked.

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 2:14-cv-1414 JCC - 16

**Teller & Associates, PLLC**
1139 34th Ave, Suite B
Seattle, WA  98122
(206) 324-8969  Fax: 860-3172

*Id.* In other words, the disparity in termination rates and the number of hours provided per week cannot be explained by chance.

Plaintiffs' experiences further illustrate that race is the common answer to the question of why African American Laborers were treated differently than non-African American Laboerers. Defendants expressly acknowledged that they stopped evaluating laborers against "skills that are not required to perform the expected work." ECF No. 25-6 at 50. Further supervisors demonstrated their illegal biases against African American Laborers and other protected classes on numerous occasions. *Supra*, 6:15-9:16. Such broadly expressed illegal bias demonstrates a pervasive use of illegal stereotypes within management contradicting the general assumption expressed in *Dukes* that "most managers in a corporation that forbids [illegal] discrimination—would select [discrimination]-neutral, performance-based criteria for hiring and promotion[.]" *Dukes*, 131 S. Ct. at 2554.

**3.    Plaintiffs' Claims Are Typical of the Class Claim**s. Rule 23(a)(3) requires that the "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). The commonality and typicality requirements of Rule 23(a) tend to merge." *Falcon*, 457 U.S. at 157 n. 13. In *Staton*, "[t]he named plaintiffs . . . include[d] a very broadly selected cross-section of different categories of Boeing employees." *Staton*, 327 F.3d at 957. Here there is only one category of worker: the African American Laborer dispatched from the Local 440 to perform work on the UW Light-Rail Project. The claims are founded on Defendants subjective and arbitrary employment policies regarding the retention and treatment of these individuals and the defenses against Plaintiffs' claims are no different.

**4.    Plaintiffs and Their Counsel Will Fairly and Adequately Protect the Interests of the Class**. In determining whether the named plaintiffs will fairly and adequately protect the interests of the class, courts in the Ninth Circuit ask two questions: "(1) Do the

**Teller & Associates, PLLC**
1139 34th Ave, Suite B
Seattle, WA  98122
(206) 324-8969   Fax: 860-3172

1    representative plaintiffs and their counsel have any conflicts of interest with other class

2    members, and (2) will the representative plaintiffs and their counsel prosecute the action

3    vigorously on behalf of the class?" *Staton*, 327 F.3d at 957 (citing *Hanlon*, 150 F.3d at 1020).

4    This requirement is satisfied as long as one of the class representatives is an adequate class

5    representative. *Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands,*

6    *Inc.*, 244 F.3d 1152, 1162 n. 2 (9th Cir.2001).  "Adequate representation depends on, among

7    other factors, an absence of antagonism between representatives and absentees, and a sharing of

8    interest between representatives and absentees." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970,

9    985 (9th Cir. 2011) (citations omitted).

10        Plaintiffs share a common interest in enforcing laws against race discrimination and

11   eliminating race discrimination against African American Laborers on the worksite, where they

12   are all members of the same protected class.  Plaintiffs further have a shared interest in seeking

13   compensation for Defendants' actions of discriminating against African American Laborers as

14   well as Defendants' subjective employment practices that had a disparate impact on African

15   American Laborers.  Class counsel is experienced and has been assisting workers enforce civil

16   rights in employment for over 20 years.  ECF No. 25-0 at 7:9-10.

17   **B.  Plaintiffs Meet the Requirements for Certification Under Rule 23(b)(3)**

18        1.    Common Factual and Legal Questions Concerning Defendants' Conduct

19   Predominate Over Any Individual Damages Issues.   In evaluating whether common issues

20   predominate (the "Predominance" element), the operative question is whether a putative class is

21   "sufficiently cohesive" to merit representative adjudication.  *Amchem Prod., Inc. v. Windsor*,

22   521 U.S. 591, 623 (1997).  Mere allegations of a pattern or practice of discrimination do not *per*

23   *se* satisfy the predominance requirement.  *Falcon*, 457 U.S. at 157 ("[T]he allegation that such

24   discrimination has occurred neither determines whether a class action may be maintained in

25   accordance with Rule 23 nor defines the class that may be certified").  "Such allegations must,

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 2:14-cv-1414 JCC - 18

**Teller & Associates, PLLC**
1139 34th Ave, Suite B
Seattle, WA  98122
(206) 324-8969  Fax: 860-3172

1   as here, still be subject to generalized proof.  Though common issues need not be 'dispositive of

2   the litigation,' they must 'present a significant aspect of the case [that] can be resolved for all

3   members of the class in a single adjudication' so as to justify 'handling the dispute on a

4   representative rather than an individual basis.'"  *Ellis*, 285 F.R.D. at 537 (Quoting *Hanlon*, 150

5   F.3d at 1022).

6          In *Ellis*, an employment discrimination class action, the court found that a pattern and

7   practice of subjective employment decision-making that commonly affected a protected class

8   was sufficient to meet the Predominance requirement.  *Id.* at 538.  Similarly here, "[r]esolution

9   of Plaintiffs' challenge to those practices will resolve significant issues with respect to the class

10  as a whole, and this dwarfs individualized issues as to particular employment decisions."  *Id.*

11         Regarding Plaintiffs' disparate treatment claim, under the method of proof outlined in

12  *Teamsters*, a determination that Defendants have "engaged in a pattern or practice of

13  discrimination such that all class members are entitled to a presumption of discrimination, is a

14  common issue subject to classwide resolution."  *Id.*  Regarding Plaintiffs' disparate impact

15  claim, "whether Defendant's facially neutral policies and practices have a disparate impact on

16  class members, and whether those practices are nonetheless justified by business necessity, are

17  similarly issues best addressed with respect to the entire class."  *Id.* (citations omitted).

18         Although this case does present individualized questions with respect to any particular

19  class member's entitlement to relief, Plaintiffs' proposed trial plan (see below) addresses these

20  concerns by employing the *Teamsters* framework, in which individual class members will

21  present their claims for relief in a second phase of trial if liability is established, and Defendants

22  will have an opportunity to present individualized defenses with respect to each class member.

23  *Id.* at 539.  The need for individualized hearings does not, on its own, defeat class certification.

24  *Id.* (citing *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir.1975) ("The amount of damages is

25  invariably an individual question and does not defeat class action treatment."), *Stearns v.*

**Teller & Associates, PLLC**
1139 34th Ave, Suite B
Seattle, WA  98122
(206) 324-8969  Fax: 860-3172

1    *Ticketmaster Corp.*, 655 F.3d 1013, 1026 (9th Cir.2011) (citing *Blackie* in a case decided after

2    *Dukes* and the 9th Circuit's decision in *Ellis*).

3         2.    Plaintiffs Satisfy the Superiority Requirement.  Rule 23(b)(3) requires that a class

4    action be "superior to other methods for the fair and efficient adjudication of the controversy."

5    Ellis, 285 F.R.D. at 539-40 (citing *Hanlon*, 150 F.3d at 1023).   The court considers the

6    following non-exclusive factors in evaluating superiority:  (A) the class members' interests in

7    individually controlling the prosecution or defense of separate actions; (B) the extent and nature

8    of any litigation concerning the controversy already begun by or against class members; (C) the

9    desirability or undesirability of concentrating the litigation of the claims in the particular forum;

10   and (D) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3).

11        These factors support classwide treatment in the instant case.   Given the common

12   questions affecting the class as a whole at the liability stages of this matter, and given class

13   members' ability to opt out of the monetary relief class or to pursue their claims for relief in the

14   second state of the proceedings under (b)(3), class members have a diminished interest in

15   individually controlling the common portions of this action.   Further the Rule 23(b)(3)

16   certification framework safeguards "the due process rights of those class members, i.e. the right

17   'to decide for themselves whether to tie their fates to the class representatives' or go it alone.'"

18   *In re Motor Fuel Temperature Sales Practices Litig.*, 279 F.R.D. 598, 606 (D.Kan. 2012)

19   (emphasis in original) (quoting *Dukes*, 131 S.Ct. at 2559).  The size of the class (estimated to be

20   between 30 to 40) is manageable.  Plaintiffs' trial plan also presents a manageable way to

21   adjudicate these class members' claims.

22        Because Plaintiffs point to a common practice of subjective employment decision-

23   making, judicial economy favors adjudicating their claims together in one proceeding on the

24   common issues.  Indeed, a classwide adjudication is far more manageable than the alternative

25   individual proceedings on all issues, because it has the potential to resolve multiple issues in one

**PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 2:14-cv-1414 JCC - 20**

**Teller & Associates, PLLC**
1139 34th Ave, Suite B
Seattle, WA  98122
(206) 324-8969  Fax: 860-3172

proceeding before proceeding to individual hearings on relief.  *See United States v. City of New York*, 276 F.R.D. 22, 49 (E.D.N.Y.2011) ("In deciding whether class certification will achieve substantial efficiencies, the proper comparison is not between class litigation and no litigation at all, but between class litigation and actions conducted separately by individual class members.").  Classwide adjudication on common issues also prevents inconsistent verdicts.

### C. The Court Should Certify the Availability of Class Punitive Damages Under Rule 23(b)(3)

Plaintiffs' punitive damages claim may properly be certified under Rule 23(b)(3).  The Supreme Court has held that "§ 1981a provides for punitive awards based solely on an employer's state of mind[.]"  *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999).  "[P]unitive damages . . . are aimed at deterrence and retribution."  *State Farm Mut. Auto. Ins. v. Campbell*, 538 U.S. 408, 416 (2003).  Given the nature of Plaintiffs' claims alleging a pattern or practice of discrimination, the punitive damages inquiry necessarily focuses on Defendants' conduct with respect to the class as a whole, rather than any individual employment decisions with respect to specific employees.  *Ellis*, 657 F.3d at 987-88 (punitive damages claims "do not require an individual determination"); *Barefield v. Chevron, U.S.A., Inc.*, 12 Fed. R. Serv.3d 1232, at *3 (N.D.Cal.1988) (citing *Jenkins v. Raymark Industries*, 782 F.2d 468, 474 (5th Cir.1986), *reh. denied*, 785 F.2d 1034 (5th Cir.1986).

### IV.  PROPOSED TRIAL PLAN

Plaintiffs propose two stages to the litigation:  First Plaintiffs propose to adjudicate liability for pattern-or-practice disparate treatment claims and disparate impact claims, as well as the *availability* of punitive damages in Stage One of the litigation before a jury.  *See e.g. Ellis*, 285 F.R.D. at 505, 537-539; *Teamsters*, 431 U.S. at 357-362.  Success will support a rebuttable inference that all class members were victims of the discriminatory practice, and will justify "an award of prospective relief," such as "an injunctive order against the continuation of the

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 2:14-cv-1414 JCC - 21

**Teller & Associates, PLLC**
1139 34ᵗʰ Ave, Suite B
Seattle, WA  98122
(206) 324-8969  Fax: 860-3172

discriminatory practice." *Teamsters*, 431 U.S. at 361.  Plaintiffs then propose "Teamsters hearings" in order to adjudicate individual claims for backpay or particularized injunctive relief and compensatory damages, as well as the individual's share of punitive damages.  *Ellis*, 285 F.R.D. at 505; *Dukes*, 131 S.Ct. at 2552 n. 7, 2561.

Defendants are not prejudiced by this framework and would then have the opportunity to demonstrate that the challenged practices are "consistent with business necessity" and that there was no less discriminatory alternative. § 2000e–2(k)(1)(A)(i)–(ii).  Defendants would also have the opportunity to "demonstrate that the individual applicant was denied an employment opportunity for lawful reasons."  *Id.* (quoting *Teamsters*, 431 U.S. at 362).

## V.  CONCLUSION

This case is a straightforward challenge to a system of subjective employment decision making at the UW Light Rail Project.  It presents common questions of liability and relief under Title VII, § 1981 and the WLAD and Plaintiff's case is well-suited for class treatment.  For the foregoing reasons, Plaintiffs respectfully request the Court certify the proposed Class pursuant to Rule 23, appoint Plaintiffs as Class representatives, and appoint Teller & Associates, PLLC as Class counsel.

RESPECTFULLY SUBMITTED AND DATED this 15th day of June, 2015.

TELLER & ASSOCIATES, PLLC

By: _____
Gregory A Hitzel, WSBA #39348
Stephen Teller, WSBA #23372
Beth Touschner, WSBA # 41062
Teller & Associates, PLLC
Attorney for Plaintiffs

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 2:14-cv-1414 JCC - 22

**Teller & Associates, PLLC**
1139 34th Ave, Suite B
Seattle, WA  98122
(206) 324-8969   Fax: 860-3172

**CERTIFICATE OF SERVICE**

I hereby certify that on June 15, 2015, I caused to be electronically filed the foregoing PLAINTIFFS' MOTION FOR CLASS CERTIFICATION with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the Defendant through the following attorneys of record:

DEFENDANTS' COUNSEL

Steven H. Winterbauer, WSBA No. 16468
WINTERBAUER & DIAMOND PLLC
1200 Fifth Avenue, Suite 1700
Seattle, WA 98101
Telephone:  206-676-8440
Fax:  206-676-8441
Email:  mail@winterbauerdiamond.com
Attorneys for Defendants Traylor Frontier-Kemper Joint Venture and Traylor Bros. Inc.

I certify under penalty of perjury that the foregoing is true and correct.

DATED this 15th day of June, 2015.

_____
Gregory A Hitzel, WSBA #39348
Teller & Associates, PLLC
Attorneys for Plaintiff

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 2:14-cv-1414 JCC - 23

**Teller & Associates, PLLC**
1139 34th Ave, Suite B
Seattle, WA  98122
(206) 324-8969   Fax: 860-3172