1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

LEONARD ROLLINS, et al.,

Plaintiffs,

v.

TRAYLOR BROS., INC., et al.,

Defendants.

CASE NO. C14-1414 JCC

ORDER GRANTING MOTION FOR
CLASS CERTIFICATION

This matter comes before the Court on Plaintiffs' Motion to Certify the Class (Dkt. No. 24). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS the motion for the reasons explained herein. The Court also GRANTS Plaintiffs' request to bifurcate trial, and ORDERS additional briefing on the specifics of how trial shall be bifurcated.

I.    BACKGROUND

Defendant Traylor Bros., Inc. is a civil contractor; co-defendant Traylor Bros., Inc./Frontier-Kemper Joint Venture ("TFK") was the prime contractor for the Sound Transit "University Link" light-rail project. (Dkt. No. 55 at 1.) This was known as the "U220 Project," and involved the construction of two twin-bored tunnels running between planned transit stations at the University of Washington and Capitol Hill. (*Id.* at 2.) An unrelated contractor, Jay

Dee/Coluccio/Michels Joint Venture ("JCM"), was responsible for a related tunneling project, known as the "U230 Project." (Dkt. No. 53 at 2.) Sound Transit required TFK to staff the U220 Project with workers from local labor unions. (Dkt. No. 53 at 8.) At least one of these unions, Laborer's Local 440 ("Local 440"), dispatched workers to both the TFK and JCM sites. (Dkt. No. 26 at 5.) The U220 Project began in June of 2009 and was completed in August of 2013. (Dkt. No. 53 at 4.)

In response to "allegations of discrimination and harassment" made by black laborers regarding TFK during the U220 Project, Sound Transit hired Marcella Flemming Reed to investigate the matter. (Dkt. No. 25-1 at 11.) Reed ultimately determined that TFK personnel's subjective decisionmaking had a disparate impact on black laborers. (*Id.* at 15-16.)[1] As part of Reed's report, Dr. Nayak L. Polissar, an independent statistician, analyzed data provided by Sound Transit on hours worked by laborers dispatched to the TFK and JCM sites. (*Id.* at 16.) Polissar found that black laborers dispatched to the TFK site had an approximately threefold higher risk of not being hired or of being terminated after hiring than white laborers. (*Id.*) According to Polissar, this disparity was very unlikely to have occurred by chance. (*Id.*) In comparison, Polissar found that there was not a statistically significant difference for either of these risks between black and white laborers at the JCM site. (*Id.*) Polissar also found that, on average, white and Hispanic laborers worked twice as many hours a week as black laborers at the TFK site; whereas there were no statistically significant differences in work hours between

---

[1] In their response to Plaintiffs' motion for class certification, Defendants argue that the Court should strike Reed's opinions because she is not an expert. In stating Reed's opinion regarding disparate impact here, the Court is simply providing background—it does not in any way rely on it. Where the Court quotes from or references Reed's investigation report elsewhere in this Order, it does so in compliance with Fed. R. Evid. 701.

ORDER GRANTING MOTION FOR CLASS CERTIFICATION
PAGE - 2

ethnic groups at the JCM site. (*Id.*) After considering TFK's response, the Sound Transit Board accepted Reed's conclusions and required TFK to comply with an "Action Plan" addressing these issues. (Dkt. No. 25-6 at 40-47.)

The Named Plaintiffs in this matter were each dispatched to the TFK site. (Dkt. No. 36 at 8.) They allege that Defendants engaged in unlawful discrimination against laborers perceived to be of African descent ("black laborers"), and employed policies and practices that disparately impacted this class. (Dkt. No. 6 at 10.) Plaintiffs assert claims under Title VII of the Civil Rights Act of 1964, Section 1981 of the Civil Rights Act of 1866, and the Washington Law Against Discrimination. (*Id.*) Plaintiffs now request class certification under Fed. R. Civ. P. 23.

## II.    DISCUSSION

### A.    Class Certification Standard

Fed. R. Civ. P. 23 provides the standard for class certification. As the party seeking class certification, Plaintiffs "bear[] the burden of demonstrating that the requirements of Rules 23(a) and (b) are met." *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union  v. ConocoPhillips Co.*, 593 F.3d 802, 807 (9th Cir. 2010). A court facing a class certification motion is required to conduct "a rigorous analysis" to ensure that the Rule 23 requirements are satisfied. *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 161 (1982). Pursuant to Rule 23(a), a court may certify a class only if the following four elements are met:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. Proc. 23(a).  After satisfying the Rule 23(a) prerequisites, a plaintiff must also demonstrate that the case is maintainable as a class action under one of the three Rule 23(b) prongs. Here, Plaintiffs argue that the class is certifiable under the third prong of Rule 23(b). This prong—Rule 23(b)(3)—requires two separate inquiries: (1) do issues common to the class "predominate" over issues unique to individual class members, and (2) is the proposed class action "superior" to other methods available for adjudicating the controversy. Fed. R. Civ. P. 23(b)(3).

In determining whether the Rule 23 requirements have been met, "the question is not whether the plaintiff [has] stated a cause of action or will prevail on the merits." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78 (1974) (*quoting Miller v. Mackey Int'l*, 452 F.2d 424, 427 (5th Cir. 1971)) (internal quotation marks omitted). A court is required to examine the merits of the underlying claim, "only inasmuch as it must determine whether common questions exist; not to determine whether class members could actually prevail on the merits of their claims." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 n.8 (9th Cir. 2011) (citing *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2552 n.6 (2011)); *see also United Steel*, 593 F.3d at 809 ("But a court can never be *assured* that a plaintiff will prevail on a given legal theory prior to a dispositive ruling on the merits, and a full inquiry into the merits of a putative class's legal claims is precisely what both the Supreme Court and we have cautioned is not appropriate for a Rule 23 certification inquiry.").

In addition to the class certification requirements explicitly provided for in the Federal Rules, courts have also found certain implicit requirements for class certification. *See* William B. Rubenstein, Newberg on Class Actions §§ 3:1–3:3 (5th ed. 2015) (collecting cases). Defendants have challenged Plaintiff's ability to meet one of these implicit requirements: that the class must

be sufficiently "ascertainable." *See Lilly v. Jamba Juice Co.*, 308 F.R.D. 231, 236 (N.D. Cal. 2014) ("[T]his Court joins numerous circuit courts and courts of this district in finding that [ascertainability] is an inherent requirement of at least Rule 23(b)(3) class actions."). Therefore, when examining the merits of Plaintiff's class certification motion, the Court will address the following elements: (1) ascertainability; (2) numerosity; (3) commonality; (4) typicality; (5) adequacy; (6) predominance; and (7) superiority. The Court will also address Plaintiffs' request to certify the availability of punitive damages for classwide determination, and their related request to bifurcate trial.

### B.    Admissibility of Evidence

Defendants argue that the Court should reject any hearsay evidence Plaintiffs offer in support of their class certification claim. Although it appears that the Ninth Circuit has not yet addressed this issue, "certain 'courts have held that on a motion for class certification, the evidentiary rules are not strictly applied and courts can consider evidence that may not be admissible at trial.'" *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 599 (C.D. Cal. 2008) (quoting *Rockey v. Courtesy Motors, Inc.*, 199 F.R.D. 578, 582 (W.D. Mich. 2001)). In *Parkinson*, the court held that "[u]nlike a summary judgment motion under Fed. R. Civ. P. 56, a motion for class certification is not dispositive and need not be supported by admissible evidence." *Id.* at 599. Subsequently, however, another district court in the Ninth Circuit attempted to repudiate this reasoning. *Lewis v. First Am. Title Ins. Co.*, 265 F.R.D. 536, 544 (D. Idaho 2010).

In *Lewis*, the court argued that the admissibility standard should not be relaxed at class certification because Fed. R. Evid. 1101 includes only limited exceptions. But among these exceptions is the non-exclusive category of "miscellaneous proceedings," which could

conceivably include motions for class certification. Fed. R. Evid. 1101(d)(3). Defendants do not

argue to the contrary; in fact, they do not even cite *Lewis*. Regardless, the Court finds the

reasoning in *Davis v. Social Service Coordinators, Inc.*, a later case, far more persuasive than

that of *Lewis*. No. 1:10-CV-02372-LJO-SK, 2012 WL 3744657, at *7 (E.D. Cal. Aug. 28, 2012).

In *Davis*, the court found that the evidentiary standard should be relaxed for three

reasons. The first mirrored the court's rationale in *Parkinson*: unlike motions for summary

judgment, at class certification "there is no express *requirement* that the evidence considered be

admissible for purposes of trial." *Id.* (emphasis added). Second, at class certification "the Court

is not making any binding determination as to the admissibility of evidence for purposes of trial."

*Id*. And third, at class certification "the evidence has not been fully developed through discovery

and the evidence will be subjected to greater scrutiny at the second stage." *Id.* These arguments

are entirely apposite to the matter at hand, and the Court adopts them in full. If Defendants seek

to exclude some of Plaintiffs' proffered evidence, they may do so at a later stage in the

proceedings.

Consequently, in adjudicating Plaintiffs' motion for class certification, the Court will

consider all evidence offered by the parties, regardless of its admissibility at trial. Nonetheless, in

line with the reasoning in *Parkinson*, the Court will conduct a limited inquiry into the reliability

and relevance of each party's expert opinion. *Parkinson*, 258 F.R.D. at 599.

### C.     Analysis of Class Certification Requirements

#### 1.     Ascertainable Class

Although Rule 23 does not contain a specific requirement regarding the class definition,

courts have found that it should nonetheless be "precise, objective and presently ascertainable."

*O'Connor v. Boeing North American, Inc.,* 184 F.R.D. 311, 319 (C.D. Cal. 1998). And while the

identity of every potential class member need not be known at the time of certification, the class definition must be "definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member." *Id*. Class definitions are inadequate "if a court must make a determination of the merits of the individual claims to determine whether a person is a member of the class." *Hanni v. Am. Airlines, Inc.,* No. C08–00732 CW, 2010 WL 289297, at *9 (N.D. Cal. Jan. 15, 2010). However, "it is enough that the class definition describes a set of common characteristics sufficient to allow a prospective plaintiff 'to identify himself or herself as having a right to recover based on the definition.'" *McCrary v. Elations Co.*, No. EDCV 13–00242 JGB (OPx), 2014 WL 1779243, at *8 (C.D. Cal. Jan 13, 2014). It is not fatal for class definition purposes if a court must inquire into individual records, so long as "the inquiry is not 'so daunting as to make the class definition insufficient.'" *Herkert v. MRC Receivables Corp.,* 254 F.R.D. 344, 348 (N.D. Ill. 2008) (quoting *Lau v. Arrow Fin. Servs., LLC*, 245 F.R.D. 620, 624 (N.D. Ill. 2007)).

Plaintiffs' move for certification of "a class of laborers of African American descent with dark skin and/or appearing African American (hereinafter, 'African American Laborers') who worked for Defendants at the University of Washington Sound Transit Link Light Rail project and were dismissed shortly after being hired, dismissed after working only a few shifts, and/or otherwise treated unfairly." (Dkt. No. 24 at 1.) Defendants argue that Plaintiffs' proposed class is unascertainable because it would require significant individualized fact-finding and merits determinations. The Court disagrees.

Defendants first argue that the racial component of the class makes it unascertainable. It is true that the current definition may require the Court to determine whether potential class members "appear[] African American," a complicated task. But such a task is unnecessary,

because the crux of class membership is whether potential members identify as "black" or believe that *Defendants* perceived them as such, not whether *the Court* perceives them as "African American." Moreover, nationality seems particularly irrelevant here, especially because at least one class member—Named Plaintiff Jarlin Diaz-Lerma—may not even be "American." (Dkt. No. 54-7 at 6.) Therefore, in order to clarify the requirements of class membership, the Court now modifies the class definition, which it is empowered to do. *Mazur v. eBay Inc.*, 257 F.R.D. 563, 568 (N.D. Cal. 2009). The first half of the class definition will now include: "laborers *who identify as black or believe that Defendants perceived them as black*…." With this modified definition, the Court will no longer be required to determine whether an individual *appears* sufficiently "African American" to be a class member; instead, it need only determine whether that individual believes he is black or Defendants perceived him as black. Despite the vagaries of race, it should not be difficult for the Court and the relevant parties to decide who fits in this category.

Next, Defendants argue that the proposed class is unascertainable because the latter half of the class definition is ambiguous as to when class members were dismissed and why. The challenged language includes individuals who "were dismissed shortly after being hired, dismissed after working only a few shifts, and/or otherwise treated unfairly." (Dkt. No. 24 at 1.) The words "shortly" and "after a few shifts" do create some ambiguity: a potential class member may be unsure whether the length of time that he worked would qualify under the class definition. Furthermore, as Defendants point out, including "otherwise treated unfairly" in the class definition might require the Court to engage in a merits determination in order to know whether an individual is actually a member of the class. Therefore, the Court modifies the class definition to include: "a class of laborers…who worked for Defendants…and *were not hired*

*after being dispatched, were hired but later terminated*, and/or *believe* they were otherwise treated unfairly." This modification removes all ambiguities regarding length of employment: it includes all workers who were dispatched to the TFK site and were either not hired or hired and then, at any point in the future, terminated. Nor does it require that the Court make individual merit determinations: all relevant individuals who believe they were treated unfairly are included.

Defendants make two final arguments. First, they argue that the class definition is ambiguous as to whether it includes laborers from unions other than Local 440. It plainly does— so long as they meet the class requirements. Second, Defendants argue that Plaintiffs' class definition is insufficiently ascertainable because it may include individuals whose claims are now time-barred. However, Defendants have provided no authority directly in support of this argument, and they do not argue that all class members' claims are time-barred. If Defendants wish to modify the class definition to include certain time limits, they may do so by motion. *See Amalgamated Transit Union Local 1309 v. Laidlaw Transit Servs., Inc.*, No. 05-CV-1199-IEGCAB, 2010 WL 582134, at *4 (S.D. Cal. Feb. 11, 2010) (holding that the defendant's argument that some but not all claims are time-barred "appears to be an issue that [the defendant] should be required to bring by an appropriate motion, rather than in its opposition to the motion for class certification"). The proposed class is currently limited to the lifespan of the U220 Project—2009 to 2013. This is a "precise statement of the parameters defining the class." *Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 187-88 (3d Cir. 2006). The Court is not persuaded that even if some potential class members' claims may be time-barred, the class cannot be ascertained and Plaintiffs' motion for certification should fail.

As modified, Plaintiffs' proposed class reads as follows: "A class of laborers who identify as black or believe that Defendants perceived them as black, and who worked for Defendants at the University of Washington Sound Transit Link Light Rail project and were not hired after being dispatched, were hired but later terminated, and/or believe they were otherwise treated unfairly." The Court finds this class to be ascertainable.

## 2.    Numerosity

The next element the Court must consider is numerosity. Before a class can be certified, a court must find that it is "so numerous that joinder of all members is impracticable." *Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559, 566 (W.D. Wash. 2012) (quoting Fed. R .Civ. P. 23(a)(1)). "There is no set numerical cutoff used to determine whether a class is sufficiently numerous; courts must examine the specific facts of each case to evaluate whether the requirement has been satisfied." *Id.* at 567.

Plaintiffs have currently identified thirty-two potential class members, including the Named Plaintiffs. (Dkt. No. 25 at 7.) "A class with over forty members is presumed to satisfy the numerosity requirement." *Romero v. Producers Dairy Foods, Inc.*, 235 F.R.D. 474, 485 (E.D. Cal. 2006). But courts have certified classes of fewer than forty members. *See In re Kirschner Med. Corp. Sec. Litig.*, 139 F.R.D. 74, 78 (D. Md. 1991) ("While impracticability of joinder is not determined by a numerical test alone, a class of as few as 25 to 30 members raises the presumption that joinder would be impracticable."). In addition to pure numbers, courts consider class members' financial resources as well as their ability to institute individual lawsuits. *Anderson v. Pennsylvania Dep't of Pub. Welfare*, 1 F. Supp. 2d 456, 461 (E.D. Pa. 1998). Courts also consider whether class members "may be unwilling to sue their employer individually out of fear of retaliation." *Romero*, 235 F.R.D. at 485.

Several Named Plaintiffs have declared that while they are able to share litigation expenses, they do not have the resources to pursue individual claims. (Dkt. No. 27 at 6-7 (Victor Tate)); (Dkt. No. 28 at 4-5 (Anthony Smith)); (Dkt. No. 31 at 5 (Leonard Rollins)); (Dkt. No. 34 at 4 (Reginald Wright).) Plaintiffs argue that unnamed class members will have similar financial limitations and will be similarly unable to litigate on their own. It is true that Plaintiffs' proposed trial format will require class members to individually argue their claims during the damages phase. But a class finding of liability would significantly reduce class members' individual burden, because "[t]he force of that proof does not dissipate at the remedial stage of the trial." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 361-62 (1977).

Plaintiffs have also alleged that many class members might be unwilling to litigate due to fears of retaliation. Marcella Flemming Reed, Sound Transit's investigator, found that "[w]itnesses were genuinely worried that candid and open participation in the investigation process could lead to their terminations." (Dkt. No. 25-1 at 46.) Reed acknowledged that "it is not unusual to encounter some fear during the course of an investigation, but in over 20 years of practice, [she] had never encountered the type of pervasive fear found amongst some of the current TFK employees." (*Id.*) A number of class members have testified to concerns about retaliation, (Dkt. No. 35 at 6 (Larry Daniels); Dkt. No. 30 at 4 (Solomon Hargrove); Dkt. No. 33 at 4 (Charles Murphy)), and Plaintiffs have alleged that Defendants have already engaged in retaliatory behavior. (Dkt. No. 60-5 at 2.) In response, Defendants argue, first, that Plaintiffs rely on hearsay evidence in making their arguments regarding retaliation, and second, that because the U220 Project has already concluded, any such fears are now moot.

Defendants' hearsay argument is quickly disposed of. As explained above, the Court considers all evidence at class certification regardless of its admissibility at trial. And even

though Defendants allege that Plaintiffs' arguments rely on hearsay evidence, they have not made a motion to strike any of it.

As for Defendants' argument that the conclusion of the U220 Project makes class members' fears irrelevant, the Court finds that Plaintiffs have sufficiently alleged that class members still have reason to be concerned about retaliation. Defendants apparently remained in touch with members of ongoing construction projects in the Puget Sound area after the U220 Project concluded, (Dkt. No. 60-6 at 2), and, as noted above, have engaged in retaliatory behavior in the past. This gives credence to class members' concerns that Defendants may retaliate against them if they choose to litigate individually.

The Court therefore finds that the numerosity requirement is met.

### 3.    Commonality

The Court next considers the requirement of commonality. In order for the Court to find commonality, there must be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This does not require that Plaintiffs "demonstrate that all questions are common to the class; rather, it is sufficient if either 'shared legal issues with divergent factual predicates' or 'a common core of salient facts coupled with disparate legal remedies within the class' are present." *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 506 (N.D. Cal. 2012) (quoting *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1019-20 (9th Cir. 1998)). Crucially, Plaintiffs' claims "must depend upon a common contention… of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Dukes*, 131 S. Ct. at 2551. In other words, "[w]hat matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers*

apt to drive the resolution of the litigation." *Ellis*, 285 F.R.D. at 506 (quoting *Dukes*, 131 S. Ct. at 2551). The overriding aim is to "produce a common answer to the crucial question *why was I disfavored.*" *Dukes*, 131 S. Ct. at 2552.

But although a court must consider the merits to the extent necessary to determine whether common questions exist, "[t]he court may not go so far…as to judge the validity of these claims." *USW v. ConocoPhillips Co.,* 593 F.3d 802, 808–09 (9th Cir. 2010) (internal citation omitted). "To hold otherwise would turn class certification into a mini-trial." *Ellis*, 657 F.3d at 983 n.8. As the Ninth Circuit explained in *Ellis*, "the district court was not required to resolve factual disputes regarding" whether discrimination had occurred or whether a culture of stereotyping existed at Costco. *Id.* at 983. "However, the district court was required to resolve any factual disputes necessary to determine whether there was a common pattern and practice that could affect the class *as a whole.*" *Id.*

In this case, Plaintiffs allege separate claims of disparate treatment and disparate impact. As will be explained below, the Court finds that the commonality requirement has been met for both of Plaintiffs' claims.

### a.     Disparate Treatment Commonality

"A prima facie case of a pattern or practice of discrimination is established by evidence that 'racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice.'" *Ellis*, 285 F.R.D. at 518 (quoting *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 876 (1984)). Plaintiffs thus "need not prove absolute uniformity," but only a "regular practice" or "pattern" of discriminatory decisionmaking. *Id.* This does, however, require "significant proof" that Defendants "operated under a general policy of discrimination." *Dukes*, 131 S. Ct. at 2553. Significant proof of such a policy can be shown entirely through

statistics and anecdotal evidence that demonstrate "a pattern of discrimination… even where the pattern is the result of discretionary decision-making." *Brown v. Nucor Corp.*, 785 F.3d 895, 915 (4th Cir. 2015). "The required discriminatory intent may be inferred upon such a showing." *Id.* at 914-15 (citing *Teamsters*, 431 U.S. at 339–40). The Court agrees with the Fourth Circuit—and has located no binding precedent to the contrary—that "[u]nlike a disparate impact claim, a showing of disparate treatment does not require the identification of a specific employment policy responsible for the discrimination." *Id.* at 915 (citing *Teamsters,* 431 U.S. at 336 n. 16). The Court also finds that because the TFK site is a "centralized, circumscribed environment," and because there is only a single kind of worker at issue here—laborer—this "generally increases the uniformity of shared injuries [and] the consistency with which managerial discretion is exercised." *Id.* at 910; *see also Ellis*, 285 F.R.D. at 509 (finding that a smaller and more specific class makes it more plausible that managers exercised their discretion in the same way across the class).

The Court now analyzes Plaintiffs' anecdotal and statistical evidence of discrimination.

### i.    Anecdotal Evidence of Discrimination

Plaintiffs have provided substantial anecdotal evidence of discrimination at the TFK site. John Hook, who was at one time General Superintendent for the U220 Project, (Dkt. No. 53 at 6), allegedly told Lorenzo Durant, a black crane operator: "I'm not having no nigger down here running a crane." (Dkt. No. 25-6 at 4.) Hook also appears to have a "swastika" tattooed on his hand. (25-5 at 31.) Defendants argue that the tattoo is actually a Native American symbol for luck; however, Jeremy Saperia, TFK's Project Controls Manager and designated EEO officer, (Dkt. No. 55 at 1-2), may have already admitted that the tattoo is a swastika. (*See* Dkt. No. 25-6

at 54 ("The Union…has consulted TFK asking if there is a foreman in their employment that has a 'swastika' on his hand….Jeremy Saperia offered that they did his name was John Hook."))

Charles Murphy, a black laborer who worked at the TFK site, testified that when he and another black laborer, Solomon Hargrove, were shoveling at the bottom of a hole, former General Superintendent Burt Dore, (Dkt. No. 53 at 6), said to them from up above: "You look like you are working on a chain gang. The only thing missing are the stripes." (Dkt. No. 33 at 3.) Hargrove corroborated Murphy's account of the incident, which he found "shocking." (Dkt. No. 30 at 2-3.) Murphy also testified to a number of occasions in which he alleges that Dore singled him out for worse treatment than white laborers, and that, in one instance, Dore remarked to him: "They think I'm a racist." (Dkt. No. 33 at 3-4.) After a white laborer called Murphy "nigger," Murphy reported him and the white laborer was fired. (*Id.* at 2.) Murphy testified that after this incident, most TFK managers, including Anthony ("Tony") Traylor, a Shift Superintendent and cousin of the owners of Defendant Traylor Bros., (Dkt. No. 47 at 1-2), and John Scott Stilson, also a Shift Superintendent, (Dkt. No. 48 at 2), started acting negatively towards him. (Dkt. No. 30 at 2.) Murphy believes he was ultimately fired for reporting this incident. (*Id.*)

Victor Tate, one of the Named Plaintiffs, testified that once when he was the only black laborer working in the tunnel, his supervisor, Albert ("Al") Brown, "started talking about racially segregated neighborhoods in Los Angeles, and said to [Tate,] 'You wouldn't be able to come into my neighborhood and vice versa.'" (Dkt. No. 27 at 3-4.) Tate testified that Brown swore at him on multiple occasions, telling him "You ain't worth shit" and calling him a "dumb son of a bitch." (*Id.* at 4-5.) Tate never heard Brown speak to white laborers in this manner. (*Id.*) Plaintiffs allege that Brown was the manager identified in the Sound Transit investigation who

"discharged or reassigned every [black laborer] who had been assigned to their crew, including [black laborers] considered to be strong performers." (Dkt. No. 25-1 at 44.)

Rashad Pearson, another of the Named Plaintiffs, told the Sound Transit investigator that on the night he was laid off, he heard one white crew member state to another, "We have had problems with African Americans on other work sites." (Dkt. No. 25-6 at 25-26.) Pearson also testified that a TFK manager once looked at him and said "Walk like a duck, act like a duck, must be a duck," which Pearson took to be a racially derogatory remark. (*Id*. at 25-26, 30-31.)

Anette Banda, a Hispanic women who worked on the U220 project, testified that, "[o]n numerous occasions," she heard Tony Traylor state, "We gotta keep it white; white is right," and "keep it right, keep it white." (Dkt. No. 32 at 4.) Banda testified that Traylor only made this comment when black laborers were not around. (*Id.*) Solomon Hargrove testified that "Traylor had a lot of influence on the job site," and if "Traylor wanted someone off the job site, the worker was gone." (Dkt. No. 30 at 3.) Banda also testified that she observed that black laborers were treated worse than their white counterparts, and were often given worse job assignments or no assignments at all. (*Id.* at 2-4.) Several other black laborers testified that managers repeatedly failed to assign them work or assigned them menial or difficult tasks that they did not assign to white laborers. (Dkt. No. 28 at 2-4 (Anthony Smith)); (Dkt. No. 30 at 2 (Solomon Hargrove)); (Dkt. No. 31 at 4-5 (Leonard Rollins)).

Khalid Lites, a black laborer at the TFK site, told Reed, the Sound Transit investigator, that there was an "underlying racism" at the TFK site, and that he was referred to as "boy" and told "You guys are better off shoveling." (Dkt. No. 25-4 at 9-10.) Reed found that Lites "has a lot of concern about retaliation," and "[n]ot just with TFK," since he felt that all of the mining contractors know each other. (Dkt. No. 25-4 at 9-10.) Subsequently, Lites testified for

1    Defendants that no one associated with TFK ever mistreated him because of his race. (Dkt. No.

2    43 at 3-4.)

3         Wayne Wolff, a General Superintendent for TFK, (Dkt. No. 53 at 6), forwarded a racially

4    provocative email that negatively depicted deceased black teenager Trayvon Martin. (Dkt. No.

5    25-5 at 21-24.) In a later email to Patrick Gould, an individual who appears to be connected to a

6    contractor working on the Alaskan Way Viaduct Replacement Project, Wolff attached an article

7    and video about complaints made by the NAACP regarding that project. (Dkt. No. 60-6 at 2-5.)

8    In the email, Wolff stated, "Looks like you guys have some minority issues up there." (*Id.* at 2.)

9    In response, Gould wrote, "Don't even want to watch what a bunch of crybaby niggers have to

10   say. What the fuck happened to hard work? Flap your big lips and you can have shit handed to

11   you." (*Id.*) The following day, Wolff forwarded the entire email chain to another recipient,

12   stating only, "Watch this link." (*Id.* at 2.)

13        Based on all of the above, the Court finds that Plaintiffs have provided substantial—even

14   extensive—anecdotal evidence of discrimination at the TFK site.

15

16            **ii.    Statistical Evidence of Discrimination**

17        Plaintiffs have also provided persuasive statistical evidence of discrimination at the TFK

18   site. Plaintiffs' expert, Paul Torelli, concluded that the statistical analysis performed as part of

19   the Sound Transit investigation was accurate. (Dkt. No. 25-1 at 8.) Torelli found that 63.3% of

20   black laborers (19 out of 30) were terminated, whereas 30.2% of white laborers (19 out of 63)

21   were terminated. (*Id.*) According to Torelli, this disparity is statistically significant—meaning

22   unlikely to have occurred by chance, *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39 n.6

23   (2011)—and more than three standard deviations away from equality. (*Id.*) Torelli also found

24   that black laborers averaged 16 hours of work per week, compared to 33.4 hours per week for

25

26

ORDER GRANTING MOTION FOR CLASS
CERTIFICATION
PAGE - 17

white laborers. (*Id.* at 9.) Torelli found this disparity to also be statistically significant and more than three standard deviations away from equality. (*Id.*)

As Torelli explains, if similarly qualified laborers were sent to the TFK and JCM sites through the same race-neutral dispatch process, then the JCM site is a natural control group. (Dkt. No. 60-8 at 3.) Alan Clune was responsible for dispatching workers to the TFK and JCM sites. (Dkt. No. 26 at 2.) He testified that there was no difference in the quality of workers sent to TFK and JCM, and that the same race-neutral process was employed for both sites. (Dkt. No. 26 at 5-6.) If, as Defendants argue, black laborers were terminated more often and worked less often at the TFK site because they were simply less qualified, then similar outcomes should exist at the JCM site. But Torelli agrees with the Sound Transit investigation that the data reveals no disparity between the outcomes experienced by black and white laborers at the JCM site. (Dkt. No. 60-8 at 3.) Defendants' argument therefore fails to persuade.

Defendants dispute Torelli's methodology, but they appear to have misinterpreted his statements; he has testified that he did in fact run a regression analysis and performed tests that are standard in his industry. (Dkt. No. 60-8 at 7.) Instead, the methodology of Defendants' expert, Bruce Ward, itself appears to be flawed, because it does not account for laborers who were dispatched but never hired—a significant part of Plaintiffs' class. (Dkt. No. 54-1 at 60.) Torelli also convincingly refutes Defendants' other, seemingly erroneous objections to his analysis, by demonstrating that the disparity in employment outcomes between black and white laborers would still remain large and, in general, statistically significant even when incorporating their critiques. (*Id.* at 7.)

Defendants argue that Torelli should not have analyzed the average hours a laborer worked per week *from his date of dispatch* (regardless of whether he was terminated), but rather

ORDER GRANTING MOTION FOR CLASS
CERTIFICATION
PAGE - 18

should have analyzed his average hours worked per week *while employed*. But the latter approach would employ a tainted variable: the number of days employed. As Torelli explains, this is because Plaintiffs allege that discrimination reduced the days employed for many black laborers. In contrast, discrimination could not affect a laborer's dispatch date. (*Id.*) Therefore, it appears that Defendants' approach would hide work hour disparities resulting from early termination due to discrimination. (*Id.*)

Defendants also argue that Torelli should have included data from after the Sound Transit investigation, as their expert did. However, given that Sound Transit intervened to investigate complaints of discrimination, and ultimately required Defendants to comply with an "Action Plan," the Court agrees with Plaintiffs that data from after the start of the investigation "is irrelevant to the merits of a discrimination claim and can be highly misleading." *Gonzales v. Police Dep't, City of San Jose, Cal.*, 901 F.2d 758, 761 (9th Cir. 1990). Indeed, Torelli is persuasive in arguing that Ward performed "kitchen sink regressions," which "mask[] the proper magnitude and statistical significance level of the African-American coefficient." (Dkt. No. 60-8 at 3-4.) Thus, even though Defendants argue that Plaintiffs' small class size allows the data to be easily skewed, this point applies forcefully against their own expert's analysis. And despite the apparent problems with his approach, Ward still finds a disparity in outcomes, concluding that "African American laborers are disproportionately likely to have been turned around or dismissed due to 'inability to perform tasks' shortly after dispatch." (Dkt. No. 54-1 at 65.) Although Ward attributes this to differences in laborer work experience—a disparity that, again, should also have been present in laborers dispatched to the JCM site but seemingly was not—he does not appear qualified to make this judgment. (Dkt. No. 60-8 at 6.) Nor does he have sufficient basis to do so—especially given Defendants' lack of documentation, (Dkt. No. 25-1 at

12-13), and the fact that Ward himself admits that he does not have enough data to distinguish between Plaintiffs' and Defendants' competing explanations. (Dkt. No. 54-1 at 67.)

As with Plaintiffs' anecdotal evidence, their statistical evidence convincingly supports their claims of disparate treatment. They have provided "significant proof" that Defendants operated under a "general policy of discrimination," thereby offering a compelling answer to Plaintiffs' classwide question of "why were we disfavored."

Although the Court does not now rule on whether Plaintiffs have actually proven that disparate treatment occurred, they have certainly met the commonality requirement for this claim.

### b.    Disparate Impact Commonality

The question to be answered in a disparate impact claim is "whether Defendant's policies and practices have a discriminatory impact on the Class as a whole without regard to intent." *Ellis*, 285 F.R.D. at 531. Plaintiffs must therefore "identify *specific companywide employment practices* responsible for the disparate impact." *Id.* "'[I]n appropriate cases,' giving discretion to lower-level supervisors can be the basis of Title VII liability under a disparate-impact theory— since 'an employer's undisciplined system of subjective decisionmaking [can have] precisely the same effects as a system pervaded by impermissible intentional discrimination.'" *Dukes*, 564 U.S. at 131 (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 990 (1988)). However, "[u]nder [*Dukes*], a mere showing that a 'policy of discretion has produced an overall ... disparity does not suffice.'" *Brown*, 785 F.3d at 915 (quoting *Dukes*, 131 S.Ct. at 2556). "Instead, plaintiffs who allege such a policy of discretion must demonstrate that a "common mode of exercising discretion" actually existed throughout a company." *Id.* (quoting *Dukes*, 131 S. Ct. at 2554.) Here, because only a single worksite is concerned, rather than an entire company,

Plaintiffs must show that a "common mode of exercising discretion" existed at the TFK site—an easier task. *See Brown*, 785 F.3d at 916 ("[F]or a localized, circumscribed class of workers at a single facility, a policy of subjective, discretionary decision-making can more easily form the basis of Title VII liability, particularly when paired with a clear showing of pervasive racial hostility.").

The Fourth Circuit provides three distinct factors for determining whether Plaintiffs have demonstrated that a common mode of discretion existed: "(1) when the exercise of discretion is 'tied to a specific employment practice' that 'affected the class in a uniform manner'; (2) when there is 'also an allegation of a company-wide policy of discrimination' that affected employment decisions; and (3) 'when high-level personnel exercise' the discretion at issue." *Id.* (quoting *Scott v. Family Dollar Stores, Inc.* 733 F.3d 105, 113-14 (4th Cir. 2013)). In addition, Plaintiffs must provide statistical evidence that their class was in fact disparately impacted. *See Stockwell v. City & Cty. of San Francisco*, 749 F.3d 1107, 1115 (9th Cir. 2014) ("In whatever procedural guise a disparate impact claim appears, the party asserting it must demonstrate a statistical disparity affecting members of the protected group."). The Court finds that Plaintiffs have demonstrated that all of these elements are present here.

Plaintiffs have provided substantial evidence that Defendants gave TFK managers discretion to hire and terminate laborers on the U220 Project. While Dore was General Superintendent for TFK, he appears to have had the "final say" on who was hired and where they would work. (Dkt. No. 25-1 at 79.) At the TFK site, the General Superintendent would oversee the frontline construction supervisors: Shift Superintendents (also known as "Walkers") and Foremen (also known as "Shifters"). (Dkt. No. 53 at 6.) Defendants admit that Shift Superintendents had authority to discipline and discharge on their own initiative. (*Id.*)

1  Defendants also admit that Foremen had authority to discipline on their own initiative, but assert

2  that they "could discharge only with higher approval." (Dkt. No. 53 at 6-7.)[2]

3        Plaintiffs have demonstrated that TFK managers' use of discretion was tied to several

4  employment practices that affected the class in a uniform manner. First, Plaintiffs provide

5  evidence indicating that Dore had a common practice of asking applicants irrelevant or unhelpful

6  questions in the initial interview, and that he would at times base his decision to hire upon their

7  answers. (*See* Dkt. No. 25-2 at 13-14 (deposition of Alexander Watkins alleging that Dore

8  questioning him about "Diamond Mining" even though it is unrelated to tunneling)); (*see also id.*

9  at 28-29 (alleging that Dore declined to hire Jarlin Diaz-Lerma, a Spanish speaker, because he

10  did not know certain terminology in English)); (*id.* at 4-5 (alleging that Dore's interview with

11  Ralph Garlington was "mickey mouse" and involved "simplistic questions").) Supporting these

12  allegations, Reed, the Sound Transit investigator, found that "beginning in late December 2010,

13  TFK began relying on an unstructured and subjective interview process." (Dkt. No. 25-1 at 13.)

14  Defendants ultimately acknowledged that "[w]ith regard to the use of the Dispatch Request Form

15  and the interview and sign-off process, TFK will list only the skills required for the assignment,

16  and will not include skills that are not required to perform the expected work." (Dkt. No. 25-6 at

17  50.) Plaintiffs allege that this inconsistent method of interviewing uniformly affected the class,

18  because Dore would question black laborers differently than he would white laborers.

19

20

21

22  _____

23  [2] Plaintiffs argue that, functionally, Foremen actually had de facto authority to discharge. But the
only specific example they provide is Al Brown, who appears to have been a Shift

24  Superintendent, not a Foreman. (*See* Dkt. No. 31 ("While working on the TFK project, I
worked…under Al Brown as the Supervisor/Walker and Jesse as the Shifter.")); (*see also* (Dkt.

25  No. 52 at 10 (Brown's testimony that he "became a Walker" on the U220 Project).) In any case,
the Court need not decide at this stage what level of authority Foremen—or Brown himself—

26  actually possessed on the U220 Project.

Second, Plaintiffs persuasively argue that Dore and other managers would base their employment decisions on their subjective views of laborers' appearances. Plaintiffs allege that this practice affected the class in a uniform manner, because it led to worse employment outcomes for black laborers than their white counterparts. Named Plaintiff Watkins testified that during the initial interview, Dore told him that "[b]y looking at me he could see that I'm not a miner." (Dkt. No. 25-2 at 13-14.) Dore admitted to the Sound Transit investigator that he tries to hire individuals who "look like safe, sound people." (Dkt. No. 25-2 at 24.) Plaintiffs allege that Dore told Named Plaintiff Diaz-Lerma that "No one lies to me; I know when they've had experience." (Dkt. No. 25-2 at 29.) The Court finds this concerning, because Plaintiffs also allege that Dore would often inaccurately accuse applicants of lying about their experience. (*See, e.g.*, Dkt. No. 25-2 at 5 ("Dore said to Garlington that he didn't think he was telling the truth about his experience.").) Named Plaintiff Tate testified that other black laborers who interviewed with Dore but weren't hired "said he was telling them things like 'you don't look like a miner.'" (Dkt. No. 27 at 2-3.) Tate testified that, having heard these stories, he brought a copy of his "resume, [his] certifications, and photos of [him]self performing similar work to the interviews," so that "TFK's management could not simply judge me based on my race and appearance." (*Id.* at 3.) Tate relates that "[b]efore I presented my work portfolio to Mr. Dore, he was dismissive and skeptical of me and my abilities. Mr. Dore and the other interviewer both acted as though they could look at me and tell whether or not I knew how to perform tunneling work." (*Id.* at 3.) It was only after Tate presented his work portfolio that the tone of the interview changed, and he was ultimately hired. (*Id.*)

Other managers appear to have behaved similarly. Reed, the Sound Transit investigator, found that, with regard to hiring, former General Superintendent John Hook generally "puts folks

to work unless the task is pretty strenuous and he can tell by looking at the person that they won't be able to handle the task." (Dkt. No. 25-1 at 68.) Similarly, Shift Superintendent Al Brown told Reed that "he can pick up on what someone knows by watching them work." (Dkt. No. 25-3 at 31.) Although this comment isn't patently about an individual's appearance, when coupled with Plaintiffs' assertion that Brown was the manager who terminated or transferred all black laborers assigned to him, it is troubling. (Dkt. No. 25-1 at 44.) Ultimately, after conducting her investigation, Reed found that "some managers expressed confidence in their ability to look at a laborer and assess their capability to perform certain work." (Dkt. No. 25-1 at 13.) To remedy these alleged issues, Sound Transit's Action Plan included the requirement that Defendants "not base decisions to hire on way [sic] a person looks; [and] do not assume a person will or will not be able to perform the job based on physical appearance or demeanor." (Dkt. No. 25-6 at 44.)

Third, Plaintiffs allege that Defendants had a practice of dismissing laborers without progressive discipline or documentation—and that when these decisions were documented, the records were often inaccurate. Shift Superintendent Stilson told Reed that he "doesn't keep notes regarding performance," but that he is nonetheless "decisive and makes decisions pretty quickly." (Dkt. No. 25-3 at 27-28.) Solomon Hargrove testified that "[n]ormally, companies have a system of getting written up or some formal discipline before a person could be fired. On the UW Light-Rail Project foreman [sic] fired people without warning or documentation." (Dkt. No. 30 at 3.) Although Defendants argue that they did document employment decisions, and that this documentation explains some of Named Plaintiffs' negative employment outcomes, there is reason to question this claim. As John Hook told Reed, even though a "termination slip" is supposed to demonstrate the reason for discharge, "[t]here are times…when someone might get

laid off even though the real question is whether they can effectively perform the work." (Dkt. No. 25-1 at 69.) For example, Bert Dore testified that Alexander Watkins was terminated for falling asleep on the job, (Dkt. No. 50 at 7), but Watkins's termination slip gave no specific reason for his termination. (Dkt. No. 60-11 at 2.) The only explanation was the checked box next to "Inability to Perform the Tasks Assigned to the Level of Competence Required….No Misconduct Involved." (*Id.*) Because of this discrepancy, the Court finds it difficult to give full credence to Dore's explanation.

In conducting her investigation, Reed reviewed 3,200 pages of documentary evidence. (Dkt. No. 25-1 at 12.) Her findings suggest that Defendants failed to document their managers' decisionmaking in a number of different ways. First, "there were no formal measures in place to assess performance once workers were hired." (*Id.* at 13.) Second, "[c]ontemporaneous documentation of laborer coaching and counseling of laborers does not exist." (*Id.* at 12.) Third, "TFK does not have a formal process for coaching and counseling employees in advance of a decision to terminate." (*Id.* at 13.) And finally, termination decisions "were not supported by supervisor notes or other comparable records," and termination paperwork was "limited to a checked box." (*Id.*) In its Action Plan, Sound Transit focused on these issues, emphasizing that TFK must "**Document** the reasons for a decision to hire or not to hire," "**Document** performance concerns for all employees," "Advise employee of reason for termination and **document** the specific reasons." (Dkt. No. 25-1 at 44 (emphasis in original).) Plaintiffs allege that Defendants' failure to institute progressive discipline methods and to supply accurate documentation for their employment decisions uniformly affected the class, because it enabled Defendants to terminate Plaintiffs for discriminatory reasons without explaining why.

As for the remaining *Brown* factors, the Court has already found that Plaintiffs have provided compelling evidence that high-level personnel—here, the Shift Superintendents and General Superintendent at the TFK site—exercised the discretion at issue. The Court has also described, at length, the substantial anecdotal and statistical evidence supporting Plaintiffs' allegations that sitewide discrimination affected employment decisions. Plaintiffs have therefore demonstrated that a common mode of exercising discretion existed at the TFK site. In addition, Plaintiffs' statistical evidence provides sufficient demonstration that black laborers suffered comparatively worse employment outcomes than white laborers at the TFK site.

Although the Court does not now decide whether Defendants' policies did in fact disparately impact Plaintiffs, it finds that Plaintiffs have met the commonality requirement for their disparate impact claim.

### 4.      Typicality

Next, the Court must consider typicality. Rule 23(a)(3) provides that "the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality requirement serves to ensure that "the interest of the named representative aligns with the interests of the class." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010). This is assessed by determining "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir.1992) (quoting *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985)). "[A] named plaintiff's motion for class certification should not be granted if 'there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.'" *Id.* (quoting *Gary Plastic*

*Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990)).

Here, the Named Plaintiffs are typical of class members as a whole. All seven Named Plaintiffs allege that they were discharged or never hired because of their race. (Dkt. No. 66-1 at 2 (Rashad Pearson's EEOC Charge)); (Dkt. No. 66-2 at 7 (Anthony Smith's EEOC Charge)); (Dkt. No. 66-3 at 2 (Reginald Wright's EEOC Charge)); (Dkt. No. 66-4 at 2 (Leonard Rollins's EEOC Charge)); (Dkt. No. 66-5 at 6 (Victor Tate's EEOC Charge)); (Dkt. No. 66-6 at 6 (Alexander Watkins's EEOC Charge)); (Dkt. No. 54-7 at 82 (Deposition of Jarlin Diaz-Lerma).) The common questions in this matter are whether class members were treated worse than other laborers due to their race, or were disparately impacted by Defendants' policies. Therefore, the Named Plaintiffs' claims are typical.

Although Defendants argue that the Named Plaintiffs were discharged for unique reasons, each boils down to either lack of skills or poor performance. (Dkt. No. 36 at 8-9.) In fact, Defendants explicitly argue that the racial disparity in employment outcomes at the TFK site was due to a general lack of qualifications among class members. (Dkt. No. 36 at 18 & n.20.) Thus, it appears that Defendants' arguments against the Named Plaintiffs' claims "are typical of those that [Defendants] may raise against other members of the class," which the district court in *Ellis* found to satisfy typicality. 285 F.R.D. at 535 (quoting *Ellis*, 657 F.3d at 985).

Consequently, the Court finds that Plaintiffs have satisfied the typicality requirement.

## 5.      Adequacy of Representation

Next, the Court considers whether Plaintiffs have satisfied the adequacy requirement. Rule 23(a)(4) requires that the named representative fairly and adequately protect the interests of the class. "To satisfy constitutional due process concerns, absent class members must be afforded

adequate representation before entry of judgment which binds them." *Hanlon,* 150 F.3d at 1020

(citing *Hansberry v. Lee,* 311 U.S. 32, 42-43 (1940)). To determine legal adequacy, the Court

must resolve two questions: "(1) Do the representative plaintiffs and their counsel have any

conflicts of interest with other class members, and (2) will the representative plaintiffs and their

counsel prosecute the action vigorously on behalf of the class?" *Staton v. Boeing Co.*, 327 F.3d

938, 957 (9th Cir. 2003).

Defendants do not argue that there are any conflicts of interest between the Named

Plaintiffs and other class members. Instead, they make the following two arguments: First, that

the other Named Plaintiffs' EEOC charges do not cover Jarlin Diaz-Lerma, who did not file a

charge. And second, that Plaintiffs' disparate impact claim must be dismissed because it was not

administratively exhausted.[3]

### a.    The Single Filing Rule

Defendants argue that because Diaz-Lerma's claim only relates to the initial employment

interview, he is not covered by the EEOC charges of the other Named Plaintiffs. The Court

disagrees. "In Title VII and ADEA cases, federal courts have found that so long as one plaintiff

timely files an administrative complaint, a class of similarly-situated plaintiffs may 'piggyback'

on that complaint, thereby satisfying the exhaustion requirement." *Harris v. Cty. of Orange*, 682

F.3d 1126, 1136 (9th Cir. 2012). Diaz-Lerma is similarly situated to the other plaintiffs because

he has testified that he is black and alleges that he suffered an adverse employment outcome due

---

[3] Defendants also argue that Plaintiffs' counsel have not sufficiently established that they will adequately prosecute the action on behalf of the class. The Court disagrees. Plaintiffs' counsel testify that they have "been assisting workers enforce civil rights in employment litigation for over 20 years." (Dkt. No. 25 at 7.) Based on this experience and their work in this matter thus far, the Court is confident that Plaintiffs' counsel will "prosecute the action vigorously on behalf of the class." *Staton*, 327 F.3d at 957.

to his racial appearance. (Dkt. No. 54-7 at 6, 82.)

**b.      Administrative Exhaustion**

"The administrative charge requirement serves the important purposes of giving the charged party notice of the claim and 'narrow[ing]' the issues for prompt adjudication and decision.'" *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1099 (9th Cir. 2002) (quoting *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995)). A court may consider a claim that was not included in an EEOC charge "if that claim fell within the scope of the EEOC's actual investigation or an 'EEOC investigation which *can reasonably be expected* to grow out of the charge of discrimination.'" *E.E.O.C. v. Farmer Bros. Co.*, 31 F.3d 891, 899 (9th Cir. 1994) (quoting *Sosa v. Hiraoka*, 920 F.2d 1451, 1456 (9th Cir. 1990)). Such claims may also be considered if they are "'like or reasonably related to the allegations contained in the EEOC charge.'" *Maui Police Dep't*, 276 F.3d at 1100 (quoting *Green v. Los Angeles County Superintendent of Schs.*, 883 F.2d 1472, 1475-76 (9th Cir.1989)). Defendants bear the burden of proving that Plaintiffs failed to administratively exhaust their disparate impact claim. *Kraus v. Presidio Trust Facilities Div./Residential Mgmt. Branch*, 572 F.3d 1039, 1046 n.7 (9th Cir. 2009). In deciding this issue, the Court must construe EEOC charges "with utmost liberality since they are made by those unschooled in the technicalities of formal pleading." *Maui Police Dep't*, 276 F.3d at 1100 (quoting *Kaplan v. Int'l Alliance of Theatrical & Stage Employees*, 525 F.2d 1354, 1359 (9th Cir. 1975)).

Defendants do not dispute that Plaintiffs adequately alleged disparate treatment in their EEOC charges, but they argue that they did not allege disparate impact. The Court agrees with Defendants that no Named Plaintiff explicitly alleged "disparate impact" in his EEOC charge. However, the Court finds that an investigation of Plaintiffs' disparate impact claim could

"reasonably be expected to grow out of the charge of discrimination." In their EEOC charges, several Named Plaintiffs alleged that they and other similarly situated individuals were treated worse than white laborers because of their race; an investigation into these claims could be expected to consider Defendants' employment policies as well. For example, in Rashad Pearson's EEOC charge, he claimed that he was assigned worse job duties than white laborers and was ultimately terminated due to his race. (Dkt. No. 66-1 at 2.) Presented with these claims, it would be reasonable to expect that EEOC investigators would look into Defendants' job assignment, discipline, and termination policies.

Moreover, such an investigation actually occurred. In the EEOC Determination, which was issued to Defendants, EEOC Director Michael Baldonado wrote that, at the TFK site, "terminations occurred without the use of standard progressive discipline, and use of standard procedures." (Dkt. No. 66-2 at 8.) Even though Baldonado wrote that this supported Plaintiffs' claims of "disparate treatment," (*id.*), it also supports their claims of disparate impact. This is why Plaintiffs' disparate impact claim is also "like or reasonably related" to their disparate treatment claim: both are connected to Defendants' alleged failure to institute policies to guide their managers' discretionary decisionmaking.

Defendants cite several cases in support of their argument that "an administrative charge that only alleges a discrimination claim based on disparate treatment is insufficient to exhaust a claim for disparate impact." *Hellmann-Blumberg v. Univ. of Pac.*, No. 2:12-CV-00286-GEB, 2013 WL 1326469, at *4 (E.D. Cal. Mar. 29, 2013) (quoting *De Los Santos v. Panda Express, Inc.*, No. C 10–01370 SBA, 2010 WL 4971761, at *4 (N.D. Cal. Dec. 3, 2010)). However, the only Ninth Circuit precedent that Defendants provide holds, contrary to what they claim, that an investigation of a *disparate impact* claim would not "encompass" a subsequent claim of

disparate treatment—not the other way around. *Brown v. Puget Sound Elec. Apprenticeship & Training Trust*, 732 F.2d 726, 730 (9th Cir. 1984). The Court agrees. If an EEOC charge alleges only that an employer's neutral policy caused a disparate impact, it would be unreasonable for the EEOC to separately investigate whether the claimant also suffered intentional discrimination. But when a claimant charges that he was terminated due to intentional discrimination, it would be unreasonable for the EEOC *not to* investigate the employer's termination policies, in order to determine whether these were the cause of—or at least connected to—the claimants' allegations. And as explained above, that is exactly what the EEOC did here. Therefore, *Brown v. Puget Sound Elec. Apprenticeship & Training Trust* is distinguishable, and Defendants' other proffered authority is non-binding. The Court is not persuaded, and chooses not to follow it.

Defendants also argue that because Plaintiffs did not explicitly allege disparate impact in their EEOC charges, Defendants received insufficient notice of this claim. But Baldonado's Determination, which specifically pointed to Defendants' lack of standard procedures, was provided to Defendants. (Dkt. No. 66-2 at 8.) The Sound Transit investigation report was also provided to Defendants, and it found that the "subjective decisions made by TFK personnel in the hiring and termination processes had a disparate impact that was highly correlated to race with regard to the number of turnarounds and terminations after hire of some African-American laborers." (Dkt. No. 25-1 at 15-16.) Based on its investigation, Sound Transit ordered Defendants to adopt a number of policies that would reduce the discretion it afforded its managers in hiring and termination decisions—the crux of Plaintiffs' disparate impact claim. (Dkt. No. 25-6 at 43-44.) Defendants cannot credibly argue that they were unaware that Plaintiffs might make a disparate impact claim.

Consequently, the Court finds that Plaintiffs have satisfied the adequacy requirement.

### 6.    Predominance of Common Questions

The Court must next determine whether questions common to the class predominate over those that only affect individual class members. Fed. R. Civ. P. 23(b)(3). The "Rule 23(b)(3) predominance inquiry tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "In contrast to Rule 23(a)(2), Rule 23(b)(3) focuses on the relationship between the common and individual issues." *Hanlon*, 150 F.3d at 1022. "[I]f the *main issues* in a case require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001) (emphasis added) (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1778 at 535-39 (2d ed. 1986)). However, "[w]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022.

The Court finds that common questions predominate for Plaintiffs' disparate treatment and disparate impact claims. As discussed above, Plaintiffs have presented "significant proof"—both anecdotal and statistical—that discrimination occurred at the TFK site, and that Defendants' practices disparately impacted class members. With respect to Plaintiffs' disparate treatment claim, "whether Defendant has engaged in a pattern or practice of discrimination such that all class members are entitled to a presumption of discrimination under the *Teamsters* method of proof is a common issue subject to classwide resolution." *Ellis*, 285 F.R.D. at 538. Therefore, Plaintiffs' "pattern and practice question predominates because it has a direct impact on every class member's effort to establish liability and on every class member's entitlement to ...

monetary relief." *Id.* (quoting *Ingram v. The Coca–Cola Co.,* 200 F.R.D. 685, 699 (N.D. Ga. 2001)). In the same way, "whether Defendant[s'] facially neutral policies and practices have a disparate impact on class members, and whether those practices are nonetheless justified by business necessity, are similarly issues best addressed with respect to the entire class." *Id.*

Plaintiffs' proposed bifurcated trial structure does not change this analysis. *Id.* (collecting cases supporting the proposition that "[t]he need for individualized hearings does not, on its own, defeat class certification"); *see also Blackie v. Barrack,* 524 F.2d 891, 905 (9th Cir. 1975) ("The amount of damages is invariably an individual question and does not defeat class action treatment."). As in *Ellis,* "this case does present individualized questions with respect to any particular class member's entitlement to relief, [but] Plaintiffs' proposed trial plan addresses these concerns by employing the *Teamsters* framework, in which individual class members will present their claims for relief in a second phase of trial if liability is established, and Defendant[s] will have an opportunity to present individualized defenses with respect to each class member." *Id.* at 539. In addition, the Court finds that the individualized hearings that may be conducted in the second phase of the trial "are narrow in scope and significance when compared to the threshold, classwide issues subject to generalized proof." *Id.*

The Court therefore holds that common questions on classwide issues of disparate treatment and disparate impact predominate over class members' individualized claims for relief.

## 7.    Superior Method of Adjudicating

The final factor that the Court must assess is whether a class action is "superior to other methods for the fair and efficient adjudication of the controversy." *Hanlon,* 150 F.3d at 1023. Courts look to the following factors to determine superiority:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3); *see also Zinser*, 253 F.3d at 1190 ("In determining superiority, courts must consider the four factors of Rule 23(b)(3).").

A court's consideration of these factors must "focus on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis." *Zinser*, 253 F.3d at 1190 (quoting Wright, Miller & Kane, *supra* at 562). Here, there is no indication that any class members are already engaged in litigation concerning the controversy. There is also no dispute that this is the proper forum for litigating Plaintiffs' claims—which is unsurprising, given that the U220 Project took place in Seattle. Furthermore, since common questions predominate over class members' individual concerns, it is in their interest not to individually litigate. *Ellis*, 285 F.R.D. at 540. This is especially true since Plaintiffs' proposed bifurcated trial structure will allow class members to pursue damages individually. *Id.* And, contrary to what Defendants argue, because Plaintiffs' class is sufficiently ascertainable, potential class members will be able to receive notice of the class action and opt out if they so choose, preserving their due process rights. *See id.* ("[T]he (b)(3) certification framework safeguards 'the due process rights of those class members, i.e. the right to decide for themselves whether to tie their fates to the class

representatives' or go it alone." (quoting *In re Motor Fuel Temperature Sales Practices Litig.*, 279 F.R.D. 598, 606 (D. Kan. 2012)) (internal quotation marks omitted).

Plaintiffs' class size is also manageable. *See id.* (finding a class size of approximately 700 manageable). But it is nonetheless true that because Plaintiffs make "common, classwide" claims, "judicial economy favors adjudicating their claims together in one proceeding." *Id.* Moreover, in this instance, as was the case in *Ellis*, "classwide adjudication is far more manageable than the alternative individual proceedings on all issues, because it has the potential to resolve multiple issues in one proceeding before proceeding to individual hearings on relief." *Id.*

The Court therefore finds that litigating as a class is superior to any alternate method.

### D.      Availability of Punitive Damages

Plaintiffs next argue that the Court should certify their punitive damages claims for classwide determination under Fed. R. Civ. P. 23(b)(3). 42 U.S.C. § 1981, which provides one basis for Plaintiffs' claims, (Dkt. No. 6 at 10), makes punitive damages available in cases of intentional discrimination where the defendant behaved with "malice or with reckless indifference to the federally protected rights of an aggrieved individual." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534 (1999) (quoting 42 U.S.C. § 1981). "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Id*. The purpose of punitive damages is to punish a defendant for its actions and deter it from behaving similarly in the future. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). Courts are empowered to certify punitive damages for 23(b)(3) classwide determination where there is a common question of whether these damages should be available. *See Ellis*, 285 F.R.D. at 543 (certifying the

ORDER GRANTING MOTION FOR CLASS CERTIFICATION
PAGE - 35

availability of punitive damages for classwide determination because "the punitive damages inquiry necessarily focuses on Defendant's conduct with respect to the class as a whole, rather than any individual employment decisions with respect to specific employees").

Here, there is a classwide issue as to whether Defendants intentionally discriminated against Plaintiffs: this is the core of Plaintiffs' disparate treatment claim. The related issue of whether Defendants did so with malice or reckless indifference similarly applies to the entire class.

The Court therefore certifies the availability of punitive damages for classwide determination.

### E.    Plaintiffs' Bifurcated Trial Plan

Plaintiffs have proposed that the Court adopt a bifurcated trial plan. In Stage One of this plan, the parties would attempt to establish liability for Plaintiffs' disparate treatment and disparate impact claims, and the availability of punitive damages. (Dkt. No. 24 at 21.) For Plaintiffs' disparate treatment claim, they would need to "establish by a preponderance of the evidence that ... discrimination was the company's standard operating procedure[,] the regular rather than the unusual practice." *Ellis*, 285 F.R.D. at 505 (quoting *Dukes*, 131 S. Ct. at 2552 n.7). For their disparate impact claim, they "would seek to 'establish by a preponderance of the evidence that the employer uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin.'" *Id*. (quoting *United States v. City of New York*, 276 F.R.D. 22, 34 (E.D.N.Y. 2011)). If successful on these claims, Plaintiffs would be awarded a rebuttable inference that all class members were victims of Defendants' allegedly discriminatory practices and/or suffered a disparate impact from its neutral employment policies, and the Court would be empowered to award such prospective relief as it saw fit. *Id*.

In Stage Two, the Court would hold individual hearings before a separate jury, in which the parties would try individual class members' claims "for backpay or particularized injunctive relief and compensatory damages, as well as the individual's share of any punitive damages." *Ellis*, 285 F.R.D. at 505. At this stage, an individual class member would need to show that he suffered an adverse employment decision and/or was adversely affected by a challenged policy or practice. If he can make such a showing, "the burden of proof will shift to the company, but it will have the right to raise any individual affirmative defenses it may have, and to 'demonstrate that the individual applicant was denied an employment opportunity for lawful reasons,'" *id.* (quoting *Dukes*, 131 S. Ct. at 2552), or that "a legitimate non-discriminatory reason existed for the particular adverse action." *City of New York*, 276 F.R.D. at 35 (quoting *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 162 (2d Cir. 2001), *abrogated on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011)).

Bifurcating a class action trial in this manner is not a novel idea. As the court found in *Ellis*, "courts have routinely adopted the approach advocated by plaintiffs in which the first phase of the proceedings focuses exclusively on classwide claims," while "[i]ndividual compensatory damages would be resolved in the second phase." 285 F.R.D. at 543-44. Indeed, "most courts adjudicating civil rights class actions in the employment discrimination context opt to bifurcate the liability and damages phases of the trial." *Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439, 458-59 (N.D. Cal. 1994).

Defendants argue that "a primary purpose" of bifurcating a trial is so that the Court can award injunctive relief, which they argue is unlikely here because the U220 Project ended over two years ago. The Court disagrees. Regardless of whether injunctive relief is available, "[a] court may bifurcate any trial 'in furtherance of convenience or to avoid prejudice, or when

separate trials will be conducive to expedition and economy.'" *Bates v. United Parcel Serv.*, 204 F.R.D. 440, 448 (N.D. Cal. 2001) (quoting Fed. R. Civ. P. 42(b)). Not only is it "constitutionally permissible for separate juries to hear the two phases of a bifurcated trial," *Arnold*, 158 F.R.D. at 460 (citing *Arthur Young & Co. v. U.S. District Court,* 549 F.2d 686, 693 (9th Cir. 1977)), but under Fed. R. Civ. P. 42(b), a Court possesses "broad discretion" to order bifurcation. *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1517 (9th Cir. 1985), *superseded on other grounds by* 28 U.S.C. § 1961. "Factors to be considered when determining whether to bifurcate a trial include: avoiding prejudice, separability of the issues, convenience, judicial economy, and reducing risk of confusion." *Bates*, 204 F.R.D. at 448. The Court finds that all of the *Bates* factors point toward bifurcation.

First, prejudice is avoided by determining the availability of punitive damages in Stage One, and then quantifying individual punitive and compensatory damages in Stage Two. This "safeguard[s] Defendant[s'] right to ensure that any punitive damages award remains tethered to the compensatory damages actually awarded in Stage Two." *Ellis*, 285 F.R.D. at 543. At the same time, "trying the[] potentially overlapping issues of liability and entitlement to punitive damages before a single jury ensures compliance with the Seventh Amendment's prohibition on reexamination." *Id.* Nor, as the court found in *Ellis*, does bifurcation harm Defendants' due process rights, because Defendants "will have ample opportunity to present defenses" to Plaintiffs claims. *Id.* at 544. In Stage One, Defendants will be able to present defenses to Plaintiffs' classwide claims of disparate treatment, disparate impact, and the availability of punitive damages. If Plaintiffs prevail, Stage Two "offer[s] Defendant[s] the opportunity to present evidence as to the proper amount of punitive damages as well as individualized defenses which could defeat any individual class member's claim to punitive [and compensatory]

damages." *Id.*

Second, the issues to be tried are neatly separable, making bifurcation convenient. Whether Defendants have engaged in a pattern or practice of intentional discrimination is a classwide issue, as is whether their neutral employment practices caused a disparate impact. *Ellis*, 285 F.R.D. at 543. Conversely, "compensatory damages require individual determinations." *Ellis*, 657 F.3d at 987-88. Similarly, while "the punitive damages inquiry necessarily focuses on Defendant[s'] conduct with respect to the class as a whole," whether particular Class members deserve a share of these damages is a separate question that may be given to a separate fact finder. *Ellis*, 285 F.R.D. at 543.

Third, bifurcation promotes judicial economy and reduces juror confusion. If Plaintiffs do not prevail in Stage One, there will be no need to conduct Stage Two damage hearings. *Bates*, 204 F.R.D. at 449. If they succeed, the parties may well settle, similarly obviating Stage Two. *See Arnold*, 158 F.R.D. at 459 ("[B]ifurcation would facilitate disposition of the issues since, as a practical matter, when liability is found during an initial phase, bifurcated cases often settle."). In addition, courts have found that "a unitary trial in which fact issues pertaining to both liability and class damages were combined would be substantially more complicated than a bifurcated trial, and would consequently increase the risk of jury misunderstanding." *Id.*; *see also Bates*, 204 F.R.D. at 449 ("[R]educing the types and amount of evidence to be produced in each phase of trial would promote judicial economy and reduce the risk of confusion."). Defendants argue that because of Plaintiffs' class size, it would be most efficient to proceed through joinder rather than bifurcation. But as the Court has explained, Plaintiffs proposed class is sufficiently numerous that litigating via joinder would be impracticable.

The Court therefore grants Plaintiffs' request to bifurcate trial. However, it does not now

determine the exact details of how trial will proceed, and ORDERS additional briefing on this issue, as described below.

## III.   CONCLUSION

For the foregoing reasons, having conducted a rigorous analysis of the evidence submitted by both sides, the Court finds as follows:

1. The proposed class is so numerous that joinder is impracticable.

2. There are numerous common questions of fact and law, the answers to which are apt to drive the resolution of this case.

3. The claims of the Named Plaintiffs are typical of those of the proposed class.

4. The Named Plaintiffs are adequate class representatives.

5. Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) because common questions predominate over individual questions and class treatment is the superior method of resolving the claims.

6. Teller & Associates PLLC will fairly and adequately represent the interests of the class.

7. The proposed class is certified under Fed. R. Civ. P. 23(b)(3) and defined as:
   "A class of laborers who identify as black or believe that Defendants perceived them as black, and who worked for Defendants at the University of Washington Sound Transit Link Light Rail project and were not hired after being dispatched, were hired but later terminated, and/or believe they were otherwise treated unfairly."

8. The class claims, issues, and defenses are those relating to Defendants' liability and, if appropriate, relief for Named Plaintiffs and the class.

9. Teller & Associates PLLC is appointed as counsel to the class defined above pursuant

ORDER GRANTING MOTION FOR CLASS CERTIFICATION
PAGE - 40

to Fed. R. Civ. P. 23(g).

10. The Court grants Plaintiffs' request to bifurcate trial. The parties are ORDERED to submit a joint memorandum containing the details of their proposed bifurcated trial structure and highlighting any points of dispute. This memorandum must be submitted on or before March 1, 2016.

IT IS SO ORDERED.

DATED this 21st day of January 2016.

John C. Coughenour
UNITED STATES DISTRICT JUDGE